[Cite as *State v. Culp*, 2012-Ohio-5395.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| COUNTY OF SUMMIT | )ss:<br>) | | NINTH JUDICIAL DISTRICT |

| STATE OF OHIO | C.A. No. 26188 |
| Appellee | |
| v. | APPEAL FROM JUDGMENT<br>ENTERED IN THE |
| RICHARD ALAN CULP | COURT OF COMMON PLEAS<br>COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 11 01 0018 |

DECISION AND JOURNAL ENTRY

Dated: November 21, 2012

BELFANCE, Judge.

{¶1} Defendant-Appellant Richard Culp appeals from his convictions in the Summit County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} Based upon events that took place December 11, 2010, to December 12, 2010, Mr. Culp was indicted in January 2011, on five counts of rape with repeat violent offender and sexually violent predator specifications accompanying each count and one count of kidnapping with a repeat violent offender specification and sexual motivation specification. Ultimately the matter proceeded to a jury trial. A jury found Mr. Culp guilty of the five counts of rape, the one count of kidnapping, and the accompanying sexual motivation specification. During a separate phase of the trial, the jury found Mr. Culp to be a sexually violent predator as alleged in counts one through five of the indictment. The repeat violent offender specifications were tried to the

bench, and the trial court found Mr. Culp to be a repeat violent offender as alleged in counts one through six. Mr. Culp was sentenced to a total of 50 years to life in prison.

{¶3} Mr. Culp has appealed, raising four assignments of error for our review, which will be addressed out of sequence to facilitate our review.

II.

ASSIGNMENT OF ERROR II

THERE WAS INSUFFICIENT EVIDENCE TO CONVICT THE DEFENDANT
OF RAPE AND KIDNAPPING[.]

{¶4} Mr. Culp asserts in his second assignment of error that there was insufficient evidence to support the jury's verdicts on the kidnapping and rape charges. We do not agree.

{¶5} In determining whether the evidence presented was sufficient to sustain a conviction, this Court reviews the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 274 (1991). Furthermore:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶6} The jury found Mr. Culp guilty of one count of kidnapping in violation of R.C. 2905.01(A)(4) and five counts of rape in violation of R.C. 2907.02(A)(2). It does not appear that Mr. Culp challenges the jury's finding with respect to the specifications in this assignment of error.

{¶7} R.C. 2905.01(A)(4) states that "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the

other person * * * [t]o engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]"  R.C. 2907.01(C) provides that "'[s]exual activity' means sexual conduct or sexual contact, or both."  Sexual conduct is defined as:

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶8}  R.C. 2907.02(A)(2) states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."  "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."  R.C. 2907.01(B).

{¶9}  Mr. Culp essentially asserts that, because the victim's testimony is contradicted by Mr. Culp and another witness, Linda Post, and because Mr. Culp's and Ms. Post's testimony is consistent with the physical evidence, Mr. Culp's convictions are based on insufficient evidence.  Thus, Mr. Culp's argument is in actuality a manifest weight argument, an argument which is made in his third assignment of error.  A review of the record reveals that there was sufficient evidence presented, if believed, which would convince the average mind beyond a reasonable doubt that Mr. Culp committed the crimes of kidnapping and rape.  *See Jenks,* 61 Ohio St.3d at paragraph two of the syllabus.

{¶10}  The victim testified that, on December 11, 2010, she received a phone call from her friend Sheila who invited her to attend the 25th anniversary party of the Main Street Saloon with her and their mutual friend Katie.  The victim drove to the bar and arrived around 10 p.m.

The victim's friends were already at the bar. The victim consumed two drinks over the course of the evening, and the three friends spent the night dancing, talking, and eating.

{¶11} Sometime around 1 a.m., Sheila and Katie left. Subsequently, a fight broke out in the bar, and everyone was ordered out on to the patio. At this point, the victim met a woman, who turned out to be Ms. Post. The victim had never met her before. Ms. Post asked the victim if she could give Ms. Post and Ms. Post's boyfriend a ride home. The victim agreed, and Ms. Post and a man who called himself Thor (who was in actuality Mr. Culp) got in the victim's van. The victim was directed to Ms. Post's and Mr. Culp's apartment, which was located above a business. On the way there, Ms. Post informed the victim that Mr. Culp was "an ultimate championship fighter" and that he had won lots of awards. When they arrived, the victim was invited up to the apartment to see the memorabilia.

{¶12} The three sat on a couch, and Mr. Culp showed the victim a mini sword and started talking in another language. The victim stated there were pictures and statues in the room and Mr. Culp started talking about how he was in the German mafia and "he could make people disappear and never be found." One of the items on the wall was a banner with a swastika and a skull on it. The victim testified that the discussion about causing people to disappear and the situation made her a "little leery." Mr. Culp then left the room and came back with a knife that appeared to be a large butcher knife which he took and scraped the side of the victim's face and then held to her throat. The victim testified that this incident with the knife made her "very fearful for [her] life." Mr. Culp then told the victim that he had cut Ms. Post's finger off and made Ms. Post show the victim and tell her that he cut off Ms. Post's finger. Mr. Culp then ordered Ms. Post to go to bed and took the victim into a bedroom.

**{¶13}** The victim proceeded to beg Mr. Culp to let her go home. Mr. Culp stuck the knife in her hand and told her that the only way she could stop what was happening would be to do something about it. Each time Mr. Culp put the knife in the victim's hand and said this, the victim dropped the knife. Mr. Culp undressed the victim and then undressed. The victim observed several tattoos on Mr. Culp, including one of a hammer. The victim then proceeded to describe multiple instances of penetration of her vagina by Mr. Culp's penis, fingers, and a vibrator. In addition, Mr. Culp inserted his finger into the victim's rectum. During the assault, which lasted for approximately seven hours, Mr. Culp also put the victim in several "hold[s]" which made it difficult for the victim to breathe. Only when the victim was near the point of passing out would Mr. Culp release the hold. The victim testified that Mr. Culp also forced the victim to pose so that he could take photographs and he filmed portions of the assault.

**{¶14}** According to the victim, around 7 a.m., she began telling Mr. Culp that she needed to be to work at Walmart by 8 a.m. Mr. Culp told the victim to call off, but the victim said she could not and that if she did so she might lose her job. So Mr. Culp told the victim that she should call up and tell her employer that she would be late. The victim had Mr. Culp look up the number in the phone book, and she wrote down a confirmation number inside it. Mr. Culp then wanted the victim to buy him an outfit using her employee discount. The victim agreed to do so.

**{¶15}** The victim stated that Mr. Culp allowed the victim to get dressed but kept her underwear and put it over the mirror in the bedroom. While Mr. Culp was still getting dressed, the victim told him that she was going to run out and start the car. The victim left and proceeded to drive away. Mr. Culp and Ms. Post were standing in the middle of the street behind the van as the victim left. The victim called Sheila and told her what happened. Sheila came to the

victim's house and Sheila called the sheriff. Sheila took the victim to Akron City Hospital where an examination was done. The nurse who examined the victim testified that the victim was very teary during the exam but was also very cooperative. The nurse noted redness around the victim's anus and a vaginal laceration. The nurse acknowledged that the injuries could have occurred as a result of consensual sex. The nurse also discussed a photograph she took of a laceration on the victim's face that corresponded to the location where the victim claimed that Mr. Culp rubbed a knife across her face. Minor injuries to the victim's neck area and knees were also shown to the jury. The nurse testified that the victim's statement was consistent with the nurse's findings during the physical examination. Swabs were taken from various areas of the victim, and her clothing was sent for testing. Foreign DNA was found on the victim's breast and on cuttings from her bra. No foreign DNA was recovered from the vaginal or anal swabs. After analysis, Mr. Culp could not be excluded as a contributor to the foreign DNA recovered from the victim's bra or breasts.

{¶16} The victim was later able to identify Mr. Culp out of a photographic array, and the police were able to establish that the man the victim knew as Thor was Mr. Culp. The victim did not hesitate in her identification of Mr. Culp and became emotional when she saw his photograph in the array. Further, one of the detectives who investigated the assault talked with an employee from Walmart who verified that the victim had called in to either call off work or say that she would be late.

{¶17} In light of the victim's testimony, discussed above, there was sufficient evidence presented, which if believed, would convince the average mind beyond a reasonable doubt that Mr. Culp kidnapped and raped the victim multiple times. *See Jenks*, 61 Ohio St.3d at paragraph two of the syllabus. The fact that Mr. Culp and Ms. Post testified to a different version of events

does not make the other evidence that was presented insufficient.  Mr. Culp's second assignment

of error is overruled.

ASSIGNMENT OF ERROR III

THE DEFENDANT'S CONVICTIONS FOR RAPE AND KIDNAPPING ARE
AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

{¶18}  Mr. Culp asserts in his third assignment of error that his convictions for rape and

kidnapping are against the manifest weight of the evidence.  We do not agree.

{¶19}  In reviewing a challenge to the weight of the evidence, the appellate court

> must review the entire record, weigh the evidence and all reasonable inferences,
> consider the credibility of witnesses and determine whether, in resolving conflicts
> in the evidence, the trier of fact clearly lost its way and created such a manifest
> miscarriage of justice that the conviction must be reversed and a new trial
> ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986).

{¶20}  Mr. Culp and Ms. Post testified to an entirely different version of events on the

evening of December 11, 2010, into the morning of December 12, 2010.  Mr. Culp testified that

he and Ms. Post walked to the Main Street Saloon on the evening of December 11, 2010, and got

there around 9 p.m.  It is evident from Mr. Culp's testimony that Mr. Culp and Ms. Post did not

stay together for the entire evening.  Mr. Culp testified he had about five beers that evening.  He

testified that he saw Sheila and Katie leave around 1 a.m., that he noticed the victim because she

was standing under a fan and dancing, and that he nudged his friend and said that the victim

looked like Marilyn Monroe.  According to Mr. Culp, the victim heard this, came over, and

introduced herself as "Little Debbie."  Mr. Culp introduced himself as Thor.  The two began

flirting, and Mr. Culp asked the victim if she wanted to go out on the patio and talk.  Ms. Post

was not around.  The victim agreed, and they "start[ed] kissing and * * * making out."  Mr. Culp

stated that he was kissing and licking her breast and that he unzipped her pants and stuck his

hands between her legs. The victim stopped Mr. Culp from proceeding as she was concerned someone would see them. He got her phone number from her, and they went back into the bar.

{¶21} Shortly thereafter, a fight broke out at the bar, and everybody was instructed to leave the bar. Ms. Post and Mr. Culp proceeded to go out on the patio. Mr. Culp indicated that the victim offered to give Mr. Culp a ride home and also agreed to give Ms. Post a ride as well. When they arrived at Mr. Culp's apartment, the victim indicated that she did not think she should be driving as she was a little drunk. Mr. Culp offered to let her come up to the apartment and sleep on the couch. According to Mr. Culp, the victim then went to sleep on the couch, and Ms. Post and Mr. Culp went to sleep in the bedroom. The victim woke up around 9:30 a.m. When Ms. Post got up, the victim noticed that Ms. Post was missing part of one of her fingers and asked Mr. Culp what had happened. Mr. Culp told the victim that he had done it. Mr. Culp acknowledged at trial that he was convicted of felonious assault as a result of that incident; however, he asserted that it was an accident. The victim asked to use Mr. Culp's phone and had Mr. Culp look up the number to the Walmart where the victim worked so that she could call in. Mr. Culp asked her to buy him some clothes from the store using her employee discount, and she agreed. Afterwards, the victim left. Ms. Post testified to a similar version of events which corroborated much of what Mr. Culp said concerning the time frame from when the victim took Mr. Culp and Ms. Post home and when the victim left the apartment. In addition, Ms. Post agreed with Mr. Culp's explanation for how she lost her finger and told the jury that her parents made her lie and say that Mr. Culp intentionally injured her.

{¶22} Mr. Culp denied sexually assaulting the victim and explained that he did not even have the type of knife that the victim claimed he threatened her with. He testified that Bridgette Nelson, who he described as his "friend with benefits[,]" was a cook and had knives that she

brought over to his place when she would cook for him. Although he stated that she had taken them with her, Ms. Nelson testified that she had left a large knife at Mr. Culp's apartment. When shown a photograph of several types of knives, she identified the same type of knife that the victim asserted that Mr. Culp threatened her with.

{¶23} Ms. Nelson testified that, prior to the incident at issue, she knew Mr. Culp only as Thor. Ms. Nelson testified that Mr. Culp denied having sex with the victim and that he had just offered for her to stay over because she was too drunk to drive. Mr. Culp told Ms. Nelson that the victim was upset in the morning and he thought it was because "she was Jewish and she saw his Nazi paraphernalia." He thought maybe that is why she was saying she was raped.

{¶24} Ms. Nelson testified that Mr. Culp stayed at her house sometime after December 12, 2010, in order to give her a tattoo, and that the morning following his stay, police arrived at her door looking for Mr. Culp. As Ms. Nelson only knew Mr. Culp as Thor, she told the police that Mr. Culp was not there. The police asked to come in, but Ms. Nelson told the officers that they could only come in if they had a warrant. At that point Mr. Culp went and hid in the bedroom and called his brother and lawyer. Ms. Nelson overheard Mr. Culp tell his lawyer that "'maybe something happened. Maybe I fingered her.'" After the third or fourth time of trying to come in, the officers said that they had a search a warrant, so Ms. Nelson let them inside, and they arrested Mr. Culp. Ms. Nelson was charged with obstruction of justice, for her actions in dealing with police when they came to her home. However, Ms. Nelson was told that if she testified truthfully at trial, the charge would be reduced or dismissed.

{¶25} Mr. Culp essentially asserts that the victim's version of events is uncorroborated and, therefore, the jury lost its way in convicting him. Certainly this was a case in which the jury had to decide who was more credible: the victim, or Mr. Culp. The fact that the jury found the

victim's version of events to be more credible does not require the conclusion that the jury lost its way or that a manifest miscarriage of justice occurred. Notably, the nurse found physical injuries on the victim that were consistent with the statement she provided the nurse. Moreover, DNA consistent with Mr. Culp's was found on the victim, which also tends to support the victim's testimony. While it is true that Mr. Culp's version of events also offers a reason why his DNA would be found on the victim absent a rape, in light of the evidence presented, the jury was not unreasonable in failing to believe Mr. Culp's and Ms. Post's version of events. In addition, the fact that DNA was not found in the victim's vagina does not necessitate the conclusion that the victim's testimony was false. The victim did not know if Mr. Culp used a condom. Moreover, the fact that the camera and the victim's underwear were not found at Mr. Culp's apartment does not discredit the victim's testimony. It is equally possible that the jury could have reasonably believed that Mr. Culp removed or destroyed those items. Further, the fact that the police did not recover the phone book that the victim alleges she wrote the confirmation number in or the sheets on Mr. Culp's bed was information to be weighed in assessing the victim's credibility, their absence does not mandate the conclusion that the jury's verdict was against the manifest weight of the evidence. While that evidence might have corroborated the victim's testimony, the jury was nonetheless entitled to believe the victim's testimony. In addition, the jury was aware that there was evidence that the victim did call into Walmart and did speak to an employee about either not coming in or coming in late. Moreover, the victim provided detailed testimony about an approximately seven hour assault. As the jury was able to observe not only the victim's testimony and demeanor but also the testimony and demeanor of the other witnesses, the jury was in the better position to evaluate the witnesses' credibility. *See State v. Andrews,* 9th Dist. No. 25114, 2010-Ohio-6126, ¶ 28 ("A verdict is not

against the manifest weight of the evidence because the jury chose to believe the State's witnesses rather than the defense witnesses."). Moreover, while it is true that Ms. Nelson would have a reason to be biased, the jury was aware of that possible bias and able to take that into account in considering her testimony and how much weight to give it. After a thorough and independent review of the record, we cannot say that the jury lost its way in convicting Mr. Culp of the kidnapping and rape charges. Mr. Culp's third assignment of error is overruled.

## ASSIGNMENT OF ERROR I

ADMITTING PHOTOGRAPHS OF APPELLANT'S NAZI PARAPHERNALIA WAS AN ABUSE OF DISCRETION AND DENIED THE APPELLANT A FAIR TRIAL[.]

{¶26} Mr. Culp asserts in his first assignment of error that the trial court abused its discretion in admitting two photographs, State's Exhibit 9 and State's Exhibit 13, because the probative value of the photographs was substantially outweighed by their prejudicial effect.

{¶27} "The admission of photographs is within the sound discretion of the trial court." *State v. Likosar,* 9th Dist. No. 03CA0063-M, 2004-Ohio-114, ¶ 20. "All relevant evidence is admissible, except as otherwise provided * * *." Evid.R. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Nonetheless, "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

Error may not be predicated upon a ruling which admits * * * evidence unless a substantial right of the party is affected, and * * * a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]

Evid.R. 103(A)(1).

{¶28} In the instant matter, Mr. Culp made an oral motion in limine to exclude reference to any items discovered during the search of Mr. Culp's apartment, such as Nazi flags or statues, that would be linked to the Nazi party or Neo-Nazi beliefs. The trial court denied the motion. In this case, the trial court's denial of Mr. Culp's motion was a preliminary ruling. *See State v. Winston,* 9th Dist. No. 24761, 2010-Ohio-1354, ¶ 12. Thus, to preserve his argument for appeal, Mr. Culp was required to make appropriate objections during the course of the trial. *See id.*

{¶29} Mr. Culp challenges the admission of State's Exhibit 9, which prominently depicts a banner/flag with a swastika and skull, and State's Exhibit 13, which depicts a room containing a disheveled dresser. At the time State's Exhibit 9 was introduced at trial, and prior to its admission into evidence, Mr. Culp objected. Thus, he has preserved that argument for our review. *See id.*

{¶30} Although, Mr. Culp suggests otherwise, he has not convinced us that State's Exhibit 9 was irrelevant to the State's case. The victim testified that, prior to raping her, Mr. Culp was saying that "he was affiliated with some type of organization, and then he proceeded to say he could make people disappear and things like that." The victim stated that the Nazi banner/flag was hanging near her on the wall while he was talking about the foregoing. Mr. Culp also claimed to be a part of the German mafia and spoke in another language. During this time, he also got out a knife and grazed it against the victim's cheek and told the victim that he had cut off Ms. Post's finger. The victim testified that the situation made her a "little leary[]" and ultimately made her "very fearful for [her] life." The victim's testimony concerning her surroundings, which included the presence of the Nazi banner/flag, was corroborated by the exhibit that depicted a photo of what she claimed she saw. Thus, it was relevant to her credibility as well as her credibility as to her assertion that Mr. Culp told her that he was part of the German

mafia and could make people disappear. All of this testimony was relevant to the element of restraint by force or threat for the kidnapping offense. *See* R.C. 2905.01(A)(4).

**{¶31}** Mr. Culp further argues that, even if Exhibit 9 was relevant, its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or of misleading the jury. *See* Evid.R. 403(A). Although there may be certain evidence that may be inherently prejudicial, we must nonetheless examine whether the introduction of the evidence affected the accused's substantial rights. *See* Evid.R. 103(A).

**{¶32}** In this case, after the trial court issued its preliminary ruling concerning Exhibit 9, voir dire of the jury commenced. During voir dire, Mr. Culp's attorney informed the potential jurors that Mr. Culp had a tattoo of a swastika on his body. Additionally, Mr. Culp's attorney told the potential jurors that Mr. Culp had Neo-Nazi statues and a Neo-Nazi flag in his apartment. Mr. Culp's attorney exposed the potential jurors to the precise information he did not want the State to present to the jurors during the trial. In his merit brief, Mr. Culp seems to suggest that, in light of the trial court's ruling on his motion in limine, he was forced to expose the jury to this information. However, we are not convinced that it was necessary for Mr. Culp's attorney to expose the potential jurors to *precisely* the information he wished to keep from them. Instead, it was possible for Mr. Culp's attorney to ask questions of a more general nature so as to identify jurors who could not be unbiased when faced with certain information. Moreover, at trial, prior to any reference to State's Exhibit 9, Ms. Nelson stated that Mr. Culp told her that the victim was possibly making up the accusations about Mr. Culp because "she was Jewish and she saw his Nazi paraphernalia."

**{¶33}** Thus, in light of all of the above, we fail to see how the ultimate introduction of Exhibit 9 prejudiced Mr. Culp's substantial rights. *See* Evid.R. 103(A).

**{¶34}** With respect to Exhibit 13, Mr. Culp did not object when that exhibit was discussed at trial, although he did object to its admission into evidence. Thus, at the time Mr. Culp objected to admitting the photograph into evidence, the jury was already familiar with it. Further, while Mr. Culp asserts the presence of the German military hat in the photograph was highly prejudicial, we note that the hat at issue takes up a minute portion of the photograph. The remainder of the photograph is of a dresser in a state of disarray. Additionally, we are not convinced that the average juror would recognize the hat as a German military hat. This is particularly so when the testimony about this exhibit is that the victim states "[a]nd this is also the same room that he took me into." We see no reference in the testimony to a German military hat, nor has Mr. Culp directed us to a page in the transcript that references the same in his appellate brief. Accordingly, assuming Mr. Culp preserved this issue for review, we fail to see how the probative value of the photograph was substantially outweighed by the prejudicial effect. Additionally, in light of the other evidence presented, we do not see how admission of State's Exhibit 13 affected Mr. Culp's substantial rights. *See* Evid.R. 103(A). We overrule Mr. Culp's first assignment of error.

ASSIGNMENT OF ERROR IV

THERE WAS INSUFFICIENT EVIDENCE TO FIND THE DEFENDANT A SEXUALLY VIOLENT PREDATOR AND THAT FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]

**{¶35}** Mr. Culp asserts in his fourth assignment of error that there was insufficient evidence to support a finding that he was a sexually violent predator and that that finding was against the manifest weight of the evidence. We do not agree.

**{¶36}** We have previously articulated the standards under which we review the sufficiency of the evidence and weight of the evidence in a criminal case.

**{¶37}** "'Sexually violent predator' means a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(1). R.C. 2971.01(H)(2) provides that:

> For purposes of division (H)(1) of this section, any of the following factors may be considered as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses:
>
> (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.
>
> (b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.
>
> (c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.
>
> (d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.
>
> (e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.
>
> (f) Any other relevant evidence.

**{¶38}** The jury was informed it could consider evidence presented during the first phase of the trial, as well as evidence presented during this particular phase of the trial. During the second phase of the trial, the jury heard testimony from the State's expert, Dr. James Orlando, a clinical psychologist, and the defense's expert, Dr. John Fabian, a board certified forensic and clinical psychologist.

**{¶39}** Dr. Orlando discussed the factors that influenced whether someone was likely to reoffend. The factors Dr. Orlando indicated favored a person reoffending were: impulsivity, younger age, an antisocial personality disorder, self-control problems, poor social support

system, intimacy deficits, poor coping skills, unemployment, substance abuse, chaotic lifestyle, depression, loneliness, problems with authority figures, the victim being a stranger, both the defendant and the victim being male, the use of torture, and medication noncompliance.

{¶40} Dr. Fabian testified on behalf of Mr. Culp. He interviewed Mr. Culp and had Mr. Culp take several assessments and diagnostic tests. Dr. Fabian testified that, at the time of the assaults, Mr. Culp was 42 years old and had not committed any prior sex offenses. Dr. Fabian testified that Mr. Culp did not have a significant history of mental illness, nor did he find evidence of mental illness or depression. However, the testing did reveal that Mr. Culp displayed characteristics related to a personality style that involved adventurousness, risk taking, and impulsivity. Dr. Fabian asserted that the crime was not purely motivated by sex, but was likely motivated by, or caused by, his antisocial personality traits. He noted that Mr. Culp, while not having antisocial personality disorder, did have antisocial personality traits. Dr. Fabian stated that "he has kind of a lifestyle of a rapist; unemployment, impulsivity, it was a violent act * * * ." Dr. Fabian averred that Mr. Culp did not appear to have a sexually deviant paraphilia disorder, although he did score about average on a scale designed to measure psychopathic traits. Dr. Fabian estimated that his score on that scale was similar to that of the average offender at a medium security prison such as Mansfield Correctional Institution. Dr. Fabian also testified about Mr. Culp's performance on the Static-99, which is an actuarial assessment that examines certain factors and results in a number that represents the person's likelihood to reoffend based upon those factors. Dr. Fabian concluded that Mr. Culp scored either a four (if Mr. Culp lived with Ms. Post for at least two years) or a five (if he lived with Ms. Post for less than two years). Dr. Fabian's report, which was admitted as evidence, indicates that 7.1% of offenders with scores of 4 recidivated after 5 years, whereas 12.8% of offenders with scores of 5 recidivated

after 5 years. However, as pointed out by the State, a score of four or five is categorized as a moderate to high risk score on the coding form, whereas a score of two or three would be a low to moderate risk score. In addition, Dr. Fabian discussed the statutory factors and whether Mr. Culp's behavior and characteristics caused any of the factors to apply to him. Dr. Fabian noted that Mr. Culp had not been convicted of any other sex offenses, did not exhibit deviant sexual behavior as a juvenile, and had not chronically committed other offenses with a sexual motivation. *See* R.C. 2971.01(H)(2)(a)-(c). However, Dr. Fabian did testify that R.C. 2971.01(H)(2)(d) and (e) could apply to Mr. Culp given some of the testimony from the first phase of the trial. Dr. Fabian acknowledged that Mr. Culp demonstrated hostility towards women, has poor coping skills, is impulsive, has problems with authority, and has a history of unemployment and potentially a history of substance abuse. However, Dr. Fabian asserted that he considered those traits when making his ultimate determination. Overall, Dr. Fabian stated that it was his opinion that Mr. Culp was not likely to reoffend in the future.

{¶41} Based upon all the evidence presented at trial and the testimony of the psychologists, we cannot say that the jury's determination that Mr. Culp was a sexually violent predator was based upon insufficient evidence or was against the manifest weight of the evidence. Even Mr. Culp's expert, Dr. Fabian, acknowledged that factors R.C. 2971.01(H)(2)(d) and (e) could be said to apply to Mr. Culp. It is arguable that the jury could have concluded that Mr. Culp tortured the victim. *See* R.C. 2971.01(H)(2)(d). The jury was instructed that torture "means to inflict pain to body or mind for purposes of punishment, or to extract a confession or information, or for sadistic pleasure." Mr. Culp has not challenged that instruction on appeal. At trial, the victim testified that Mr. Culp placed her in holds on more than one occasion that compromised her ability to breathe and that he kept her in the hold until she was just about to

pass out. Further, the victim testified that while she was in one of the holds, Mr. Culp told her that "'[y]ou're gonna learn to like pain[.]'" The jury could have reasonably concluded that this amounted to torture, particularly given that the victim testified that the assault lasted approximately seven hours. Further, this same testimony concerning the holds Mr. Culp placed the victim in could support a finding that factor (e) applied to Mr. Culp. *See* R.C. 2971.01(H)(2)(e). Finally, the psychologists supplied the jury with a great deal of relevant information that would fit within factor (f). *See* R.C. 2971.01(H)(2)(f). For example, Dr. Fabian acknowledged that Mr. Culp was impulsive, had antisocial personality traits, had a history of unemployment and possibly of substance abuse, and had problems with authority. Dr. Orlando testified that those traits were possessed by someone who was more likely to offend. Even the Static-99 assessment according to its coding instrument indicated that Mr. Culp has a moderate to high risk score. In addition, the jury also heard testimony at trial that Mr. Culp cut off Ms. Post's finger.

{¶42} After a thorough and independent review of the record, we can neither say that the jury's finding was based upon insufficient evidence, nor was it against the manifest weight of the evidence. Accordingly, Mr. Culp's fourth assignment of error is overruled.

III.

{¶43} In light of the foregoing, we overrule Mr. Culp's assignments of error and affirm the judgment of the Summit County Court of Common Pleas.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
EVE V. BELFANCE
FOR THE COURT

WHITMORE, P. J.
DICKINSON, J.
CONCUR.

APPEARANCES:

BARBARA J. ROGACHEFSKY, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.