[Cite as *State v. Mims*, 2014-Ohio-5338.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
No.   100520

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**ULANDO D. MIMS**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-572465

**BEFORE:**   Boyle, A.J., Rocco, J., and E.A. Gallagher, J.

**RELEASED AND JOURNALIZED:**   December 4, 2014

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1350 Standard Building
1370 Ontario Street
Cleveland, Ohio   44113

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Brian R. Radigan
        Jennifer L. O'Malley
Assistant County Prosecutors
Justice Center
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, A.J.:

**{¶1}** Defendant-appellant, Ulando Mims, appeals his convictions, raising the following two assignments of error:

I.   The trial court erred and abused its discretion in the admission of irrelevant and highly prejudicial evidence, in violation of defendant's right to due process of law, as protected by the Fourteenth Amendment to the United States Constitution.

II.   The defendant was provided ineffective assistance of counsel, in violation of his right to counsel, as protected by the Sixth Amendment to the United States Constitution.

**{¶2}** Finding no merit to the appeal, we affirm.

<u>Procedural History and Facts</u>

**{¶3}** In March 2013, the Cuyahoga County Grand Jury returned an 18- count indictment against Mims for sexual offenses committed against three child relatives: T.J. (d.o.b. July 8, 2003); C.B. (d.o.b. June 10, 1998); and A.J. (d.o.b. February 23, 2007).   Specifically, Mims was charged with nine counts of kidnapping, four counts of rape, four counts of attempted rape, and one count of gross sexual imposition.   All of the counts contained sexual predator specifications, and the kidnapping counts carried sexual motivation specifications.

**{¶4}** Mims pleaded not guilty to the charges, elected to have the court try the sexual predator and sexual motivation specifications, and the remaining charges proceeded to a jury trial.   Prior to the start of the jury trial, a hearing was held to determine whether A.J., who was then six years old, was competent to testify.   The court determined that she was competent to testify.

I.   *Trial*

**{¶5}** The state called 13 witnesses, including the alleged victims, and presented the

following evidence at trial.

{¶6}     In November 1999, Mims married Felicia, who is the mother of T.J., the sister of C.B., and the aunt of A.J.   Mims and Felicia also have a nine-month- old child together. Felicia's siblings and mother have known Mims for years, even before he married Felicia. According to Felicia's mother, Brenda Bryce, she has known Mims since he was a child and loved him like a son-in-law.   By the witnesses' accounts, Felicia's siblings and mother had a "good relationship" with Mims.

{¶7}     Prior to the allegations of the sexual offenses arising, Felicia's family socialized often at the Mimses' home.   Felicia's sister, Carey V., testified that she would regularly take her daughter A.J. over to T.J.'s house to play, letting her spend the night there "maybe every other weekend."   C.B., Felicia's youngest sister, also regularly visited the Mimses' home, hanging out with T.J.

A.   *T.J. Reports Sexual Offenses and Receives Medical Treatment*

{¶8}     In March 2013, allegations of Mims committing sexual offenses against T.J. surfaced.   According to Felicia, T.J. told her that "my dad's been touchin' me in a nasty way." Felicia confronted Mims, who denied the allegations, and then Felicia called her mother, Brenda, and her sister, Tina Davis.   They immediately came over to Felicia's house, and Brenda ultimately took T.J. home with her to stay overnight.

{¶9}     Tina took T.J., who was then nine years old, to the hospital the next day to be examined.   Nadine Thomas, a sexual assault nurse examiner ("SANE"), who examined T.J. on March 7, 2013, read her narrative of the medical examination at trial, which indicated that Mims had engaged in vaginal and anal intercourse with T.J. and possibly digital penetration. Thomas's narrative further indicated an incident of oral sex.   Thomas also testified that T.J.

stated her stepfather bought a condom prior to the last incident of abuse, which was "the only time he used a condom." Thomas indicated that T.J. stated that the abuse began as a game of hide and seek — T.J. would hide and if Mims found her, he would sexually abuse her. Thomas testified that she did not find any physical trauma during the exam, but that is not uncommon.

{¶10} Based on a referral from Cuyahoga County Department of Children and Family Services ("CCDCFS"), Dr. Mark Feingold examined T.J. on April 9, 2013. He read his narrative of the Alpha Clinic examination, which corroborated the narrative provided to nurse Thomas. T.J. reported the twisted game of hide and seek that was the genesis of the sexual abuse. T.J. also described incidents of digital and vaginal penetration, anal intercourse, and oral sex. T.J. also stated to Dr. Feingold that Mims purchased and used a condom during the last incident, and that "white stuff" came out. T.J. further provided a detailed description of Mims's penis, including the fact that it would get "hard when he did it" and "would get short after a little when he didn't do it." T.J. further informed Dr. Feingold that her aunt, C.B., had witnessed at least one incident.

{¶11} According to Dr. Feingold's narrative, T.J. had experienced some urinary discomfort after the sexual abuse arose. While Dr. Feingold admitted that urinary discomfort has other causes, he opined that it is unlikely a girl of T.J.'s age would know that it could follow sexual activity.

*B. A.J. Discloses Sexual Abuse and Receives Treatment*

{¶12} Carey testified that, in March 2013, her sister Tina called to notify her of the allegations that T.J. reported against Mims, warning her to speak with her daughter, A.J., who regularly spent a lot of time at the Mimses' house. Carey immediately asked A.J. "if anyone was touching her inappropriately." A.J. responded, "Uncle UU," which is how A.J. referred to

Mims. Carey testified that she was "shocked" and telephoned the police, who ultimately drove them to Fairview Hospital for A.J. to be examined.

{¶13} Carey further testified that, at the time of speaking with A.J., she only knew of the allegations relating to T.J.; she was unaware of any allegations involving her younger sister, C.B.

{¶14} At Fairview Hospital, SANE Patrica McKee examined A.J. and testified that A.J. told her that she was sleeping at the Mimses' house when her uncle told her to go into the bedroom. A.J. told McKee her clothes were still on, but her uncle was naked, got on top of her, and put "his penis down here." McKee testified that A.J. was pointing to the genital area between her legs. McKee further testified that she saw no signs of physical trauma, but that would be consistent with what A.J. told her.

*C. A.J.'s Testimony*

{¶15} At trial, A.J., who was then six years old, testified that Mims has touched her in places "that people aren't supposed to touch." She explained that it happened at his house while her cousin, T.J., was there. A.J. testified that, while T.J. was asleep on the couch, she was watching TV when Mims told her to come into the bedroom. According to A.J., Mims pulled down his pants and tried to stick his penis into her mouth. He also tried to touch her private with his private but her underwear remained on during the incident. A.J. testified that she told Mims to stop and that he eventually stopped. According to A.J., Mims also told her to keep the incident a secret, but she did not. A.J. admitted, however, that she was too scared to tell her mom while it was happening.

*D. C.B. Discloses Sexual Abuse*

{¶16} Brenda testified that her daughter, C.B., used to go over to Felicia's house every weekend and would sometimes go over there during the week. Brenda testified that, in January

2013, she started noticing a change in the interaction between T.J. and C.B. According to Brenda, "both started becoming very withdrawn, and then C.B. started not wanting to go to Felicia's."

{¶17} In March 2013, after Felicia, Brenda, and Tina became aware of T.J.'s allegations against Mims, Tina questioned C.B., who started crying. Brenda testified that Tina took C.B. and T.J. to the hospital the next day while Felicia was at work. C.B., A.J., and T.J. were all interviewed by Shannon Sneed, a social worker with CCDCFS. Sneed testified that all three children provided details of the incidents. Sneed referred all three girls to the Guidestone Abuse Program for counseling, and referred A.J. and T.J. to the Alpha Clinic to be examined and interviewed again.

*E. C.B.'s Testimony*

{¶18} At trial, C.B., who was then 15 years old, testified that she has a good relationship with her siblings and that she is friends with her niece, T.J. According to C.B., she used to see T.J. almost every day but not as often now.

{¶19} C.B. testified that on one occasion while hanging out with T.J. in February 2012, she saw Mims unbuckle his pants and put his penis in T.J.'s mouth for "like 30 seconds." C.B. further testified that afterwards Mims told her not to say anything. Additionally, C.B. testified that during a later incident, Mims pinned her body down with his knees and rubbed his body against hers. She testified that she could not get off the bed because he was on top of her. C.B. further testified that on other occasions Mims would try to grab her buttocks and try to rub her thigh, but she would move his hand, and that nothing else happened.

{¶20} C.B. further testified that her sisters Felicia and Bobbie Jo Bennett told her to say none of the incidents happened. C.B. also indicated that she did not tell T.J. to make this story

up about Mims.   C.B. testified that she had a "pretty good relationship" with Mims.

*F.   T.J. Recants Allegations at Trial*

**{¶21}** One week prior to the commencement of Mims's trial, Felicia notified Mims's defense counsel and informed him that T.J. had changed her story.

**{¶22}** At trial, T.J., who was then 10 years old, testified that she and C.B. made up the story about Mims.   According to T.J., C.B. did not like Mims and the two of them fabricated the story to get Mims out of the house.   T.J. testified that she did not remember speaking with a social worker or hospital workers regarding the last incident of abuse.   T.J. indicated that she did not know what a condom was and did not remember saying that Mims purchased a condom or used a condom during the last incident.

**{¶23}** According to T.J., C.B. was the mastermind behind the entire plan, and C.B. told her what to say.   T.J. stated that, although she never saw Mims's penis, she was able to tell her mom about it.   T.J. testified that C.B. "watch, like, porno and stuff, and that's how, like, she found all this stuff out."   Although T.J. was unsure whether C.B. had ever seen Mims's penis before, she testified that C.B. told her how to describe it.

**{¶24}** T.J. further testified that she and C.B. were the only parties to the plan of fabricating the allegations.

**{¶25}** T.J. also testified that she is not that close to C.B. because "she's too grown for me — 'cause she talks about boys, she puts me on Instagram and FB, and puts on makeup."

*G.   Felicia's Testimony and Tape-Recorded Jailhouse Calls*

**{¶26}** The state called Felicia as a court's witness, who acknowledged that the state had to issue an arrest warrant for her to appear in court.

**{¶27}** Felicia testified that she did not call the police upon hearing T.J.'s allegations because she was "confused" and believed that T.J. needed to be examined by a doctor first. Felicia confirmed that she told Mims to leave the house upon hearing the allegations but later

allowed him to return that same night. Felicia testified that, following Mims's arrest, she received possibly threatening messages on her Facebook page and some of Mims's relatives visited her at work. Although Felicia admitted that she filed a police report against them, she testified that she did so only upon her mother's insistence.

{¶28} Felicia further admitted to telling Mims the specific details of T.J.'s allegations after he was arrested but indicated that it was not right away.

{¶29} The state offered recorded jailhouse phone calls between Felicia and Mims that took place shortly after Mims was arrested. In the recording, Felicia is heard telling Mims what T.J. reported and stating that there are "too many details." Mims asked Felicia to get them to say they were lying and repeatedly urged Felicia to talk to her daughter, emphasizing that he could not come home unless she changed her story. During the call, Felicia indicated that she had talked to T.J. and that T.J. was not changing her story. Felicia later stated in the recording that she informed T.J. how much time Mims could get but she was still insisting that this happened. At one point, Mims told Felicia to talk to T.J. when no one was around — "without no one listening." Mims further directed Felicia to tell T.J. that "I'm sorry."

{¶30} Felicia testified that she never told T.J. to change her story. According to Felicia, T.J.'s story only changed after she had a falling out with C.B.

{¶31} Upon questioning from defense counsel, Felicia testified that Mims was responsible for prohibiting C.B. from coming over to their house, which upset C.B. Felicia also testified that she did not like T.J. hanging out with C.B. because of their age difference and because C.B. was "more into boys."

*H. Evidence of Mims Using "K2" and Testimony Describing "K2" as a Narcotic*

{¶32} At trial, the state also elicited testimony from some of the witnesses as to Mims using "K2" — a synthetic marijuana. Specifically, the state first asked C.B. on redirect if anything different had happened at the time that the sexual abuse arose. C.B. responded that Mims's attitude had changed and attributed his smoking K2 as causing the change in his attitude.

{¶33} During Felicia's testimony, the state played another recorded jailhouse call wherein Felicia mentions K2 and states that she told a detective that her husband did not do anything until after he started smoking K2, which should warrant a drug treatment program instead of jail time. Felicia further testified at trial that she too smoked K2 in the house with Mims and that "K2 gives you the same feeling that you get with marijuana." Felicia described K2 as "legalized weed." The state asked Brenda about Mims smoking K2, and she testified that he was "forgetful and goofy." The state also asked Bobbie Jo on cross-examination as to her knowledge of Mims smoking K2, which she indicated that he had, along with herself and her husband.

{¶34} Over defense counsel's objection, the state further offered Captain Brian Heffernan of the Cleveland Police Department's narcotics unit to testify as to his knowledge of K2. Specifically, Captain Heffernan testified that in 2010, the Cleveland narcotics unit became aware of K2 — a brand name for a synthetic cannabinoid that was first identified in the mid-to-late 90s. Captain Heffernan testified that he was aware of two complaints concerning K2: (1) the substance was being sold to underage kids, and (2) people were hospitalized with psychiatric episodes after using it. Captain Heffernan further testified that until October 2011, the drug was legal and sold in packages labeled "not for human consumption."

{¶35} Upon resting its case, the state voluntarily dismissed one count of rape, one count of attempted rape, and six counts of kidnapping.

II. *Defense Witnesses*

{¶36} Mims offered three witnesses on his behalf: Bobbie Jo Bennett, Felicia's sister; Charles Bennett ("Chuck"), Felicia's brother-in-law (married to Bobbie Jo); and E.D., Felicia's 15-year-old nephew. These witnesses testified as to spending considerable amount of time at the Mimses' house and never observing Mims touching T.J. inappropriately.

{¶37} According to Bobbie Jo, she and her two young children and husband spent everyday at Mims's house from 2011-2012, and often spent the night. Bobbie Jo testified that "[C.B.] was hardly there," and A.J. was never there during her visits. According to Chuck, he and his family were at the Mimses' house "like everyday" in 2011 and 2012. He testified that A.J. never spent the night but C.B. occasionally did. Similarly, E.D. testified that he stayed at the Mimses' house six days a week in 2012, sleeping on the couch. According to E.D., C.B. stayed one night on the weekends. E.D. further testified that he slept over at the house with Mims, Felicia, and T.J., indicating that those were the only people sleeping there.

III. *Verdict and Sentence*

{¶38} The jury found Mims guilty on all the remaining counts of the indictment. The court found Mims guilty of the sexual motivation specifications but not guilty of the sexually violent predator specifications. The trial court subsequently sentenced Mims to a total term of life imprisonment with parole eligibility after 35 years.

Admission of "K2" Evidence

{¶39} In his first assignment of error, Mims argues that the state improperly introduced other acts evidence throughout the trial that he smoked K2, which was erroneously admitted into evidence to show his propensity to commit crime, in violation of Evid.R. 404(B). Mims contends that his use of K2 was the focal point of the trial to support the state's theory that his

"use of K2 was the reason he began molesting his stepdaughter and other children." According to Mims, the evidence of his K2 use was irrelevant and highly prejudicial.

**{¶40}** Evid.R. 404(B) provides that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The list of acceptable reasons for admitting testimony of prior bad acts into evidence, however, is non-exhaustive. *State v. Bagley,* 3d Dist. Allen No. 1-13-31, 2014-Ohio-1787, ¶ 56.

**{¶41}** In determining whether to permit other-acts evidence to be admitted, trial courts should conduct the three-step analysis set forth in *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278: (1) determine if the other-acts evidence "is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" under Evid.R. 401; (2) determine if the other-acts evidence "is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other-acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)"; and (3) consider "whether the probative value of the other-acts evidence is substantially outweighed by the danger of unfair prejudice." *Id.* at ¶ 20.

**{¶42}** With the exception of Captain Heffernan's testimony, the defense did not object to the K2 testimony that Mims challenges now on appeal. Mims therefore has waived all but plain error.

**{¶43}** "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Crim.R. 52(B)

places the following three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial: (1) there must be error; (2) the error must be an "obvious" defect in the trial proceedings; and (3) the error must have affected "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68, 759 N.E.2d 1240. The Ohio Supreme Court has interpreted the third limitation of the rule "to mean that the trial court's error must have affected the outcome of the trial." *Id.* In other words, plain error requires that "but for the error, the outcome of the trial would clearly have been otherwise." *State v. Biros*, 78 Ohio St.3d 426, 431, 678 N.E.2d 891 (1997).

{¶44} According to the state, evidence of Mims smoking K2 was not impermissible other-acts evidence, but relevant background information. Specifically, the state argues that "[t]he evidence of [Mims's] drug use corresponds to his demeanor before and during the times the criminal acts occurred as well as his plan to avoid prosecution as a whole."

{¶45} The record reveals that the first mention of Mims's use of K2 came up during the state's redirect of C.B., following defense counsel's questioning of C.B.'s recollection of the timing of Mims first committing any sexual offenses. Specifically, the prosecutor asked C.B. the following during redirect:

> Q. [Prosecutor]: [C.B.], [defense counsel] spent a lot of time asking you if anything happened before this day in February of 2012. Right?
>
> A. [C.B.]: Mm-hmm.
>
> Q. [Prosecutor]: And, you said no, right?
>
> A. [C.B.]: Mm-hmm.
>
> Q. [Prosecutor:] Was there anything different that had happened prior to 2012 when this started and then what happened after 2012 after this first time?
>
> A. [C.B.:] What do you mean? Like —

Q. [Prosecutor:] Did anything change with Mr. Mims?

A. [C.B.:] Like, yeah, like his attitude and stuff, like — mm-hmm.
Q. [Prosecutor:] Okay. Did you know whether or not he was doing anything that changed that attitude?

A. [C.B.] Yeah, he was smokin'.

Q. [Prosecutor:] What was he smoking?

A. [C.B.] K2.

{¶46} Immediately following C.B.'s answer, defense counsel objected but then withdrew the objection following a sidebar conference.

{¶47} Contrary to Mims's assertion, we do not find that the state offered this testimony to show that Mims had a propensity for committing a crime in violation of Evid.R. 404(B). Although we do not find the state's asserted grounds on appeal for supporting the introduction of this evidence to be compelling, we nonetheless find that the evidence was properly admitted.

{¶48} Our reading of the transcript reveals that the defense opened the door to C.B.'s testimony after the defense extensively questioned her credibility as to the timing of when she first observed Mims committing the sexual offenses. C.B.'s testimony reveals her association with Mims first engaging in this inappropriate conduct around the same time that he started smoking K2. This testimony therefore is relevant to the circumstances surrounding the abuse in C.B.'s mind and her credibility as to specifically remembering when it arose.

{¶49} Further, once the evidence was properly admitted through C.B.'s testimony, we find no abuse of discretion in the trial court allowing other witnesses to testify as to their knowledge of Mims smoking K2 because such testimony served only to corroborate C.B.'s testimony and bolster her credibility. *See generally State v. Culp*, 9th Dist. Summit No. 26188,

2012-Ohio-5395, ¶ 30 (recognizing that evidence corroborating victim's testimony is relevant to the victim's credibility).

**{¶50}** This evidence therefore satisfies the first two prongs of the *Williams* test as being both relevant and offered for an acceptable reason other than showing that Mims acted in conformity with his prior bad act.

**{¶51}** We likewise find no basis to conclude that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice. Having found that this evidence was relevant, we find no merit to Mims's claim that the evidence had no probative value and therefore presumably prejudicial. Moreover, we do not find Mims's prior use of K2 — a substance that was legal up until 2011 — to be so inflammatory to bias the jury to conclude that Mims's drug use proved an inclination to commit sexual offenses. This is a leap that no reasonable juror would take.

**{¶52}** But regardless, even if we agreed that the admission of the evidence was error, we find no plain error in this case. We find that the outcome of the case would have been the same even in the absence of repeated testimony concerning Mims's use of K2.

**{¶53}** Here, the three victims separately disclosed Mims committing sexual offenses against them. While Mims tries to argue that C.B. plotted to fabricate the allegations, this theory is belied by T.J.'s admission that A.J. was never a part of the plan. Despite not being aware of the "plan," A.J. unequivocally and consistently identified "Uncle UU" as touching her inappropriately. Further, the evidence revealed that A.J. had no motive to lie.

**{¶54}** Although T.J. recanted at trial, her testimony was rife with inconsistencies and contradictions. For example, T.J. described Mims's penis in detail to Dr. Feingold, but at the trial she stated that she had never seen Mims's penis. While initially unresponsive to the

prosecutor's question as to how she was able to describe previously Mims's penis, T.J. ultimately stated that C.B. told her how to describe it, but acknowledged that she did not know if C.B. had seen it. Further, both Dr. Feingold and the SANE Thomas testified that T.J. volunteered that Mims had purchased and used a condom during the last incident of sexual abuse. T.J., however, testified at trial that she did not know what a condom was nor did she have any recollection of stating anything about a condom.

{¶55} Further, the state presented circumstantial evidence that T.J. was pressured to change her story at trial. Specifically, the tape-recorded jailhouse calls revealed that Mims was pressuring Felicia to talk to her daughter so that he could come home. Notably, during the calls, Mims repeatedly pressures Felicia to talk to T.J. in order to get the charges dropped. Based on the timing of T.J. recanting — one week prior to trial — and the evidence of Mims pressuring Felicia to get T.J. to say none of it happened, the jury reasonably disregarded T.J.'s testimony at trial.

{¶56} Conversely, T.J.'s statements prior to trial consistently identified Mims as the perpetrator and consistently reported with detail the sexual offenses. As noted by Dr. Feingold, T.J., who was only nine years old at the time of reporting the offenses, testified as to urinary discomfort after the sexual abuse arose — a fact that a girl of T.J.'s age would not likely know. Notably, even Felicia noted in her conversation to Mims that T.J. was insisting that this happened.

{¶57} Finally, the statements of the three victims, coupled with the recorded jailhouse calls, convinces us that the jury would have undoubtedly convicted Mims. In the calls, Mims consistently urges Felicia to get T.J. to change her story so that he can come home. He goes as

far to tell Felicia to get T.J. alone to talk to her with "no one listening." Notably, Mims even implicates himself by directing Felicia to tell T.J. that he is sorry.

{¶58} Accordingly, based on this evidence, we find that the outcome of the trial would have been the same even if the evidence of Mims's K2 use had not been admitted.

{¶59} As for Captain Heffernan's testimony — the sole evidence that Mims objected to — we find no basis to conclude that his testimony violated Evid.R. 404(B). Captain Heffernan testified as to his general knowledge of K2 and offered no testimony specific to any bad acts committed by Mims. Indeed, the trial court specifically limited Heffernan's testimony to not include any opinion pertaining to Mims. Thus, Captain Heffernan's testimony does not constitute improper "other acts" testimony contemplated and prohibited under Evid.R. 404(B). *See State v. Persohn*, 7th Dist. Columbiana No. 11CO37, 2012-Ohio-6091 (recognizing that the detective's general testimony regarding confidential informant did not constitute other acts testimony prohibited under Evid.R. 404(B) because defendant's alleged bad acts were not even discussed during detective's testimony).

{¶60} To the extent that Mims challenges the general admissibility of Captain Heffernan's testimony under Evid.R. 401 or 403, we find that if the trial court committed any error, such error was harmless. An error is harmless if it does not affect a substantial right of an accused. Crim.R. 52(A). Disregarding Captain Heffernan's testimony, we find that the record contains overwhelming evidence to support the convictions. *See State v. Davis*, 44 Ohio App.2d 335, 338, 338 N.E.2d 793 (8th Dist.1974) (harmless error if after reading the entire record and disregarding the objectionable evidence, overwhelming evidence of defendant's guilt remains). We simply do not agree that Captain Heffernan's testimony improperly contributed

to his conviction. Accordingly, we find that the error complained of was harmless beyond a reasonable doubt and did not deprive Mims of his constitutional right to a fair trial.

**{¶61}** The first assignment of error is overruled.

<u>Ineffective Assistance of Counsel</u>

**{¶62}** In his second assignment of error, Mims argues that he was provided ineffective assistance of counsel, in violation of his Sixth Amendment right to counsel. He claims that his trial counsel was deficient by failing to object to the repeated submission of the evidence of Mims's K2 drug use and that such failure prejudiced him. We disagree.

**{¶63}** To establish ineffective assistance of counsel, a defendant must show (1) deficient performance by counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that but for counsel's errors, the proceeding's result would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

**{¶64}** Even if we agreed that defense counsel should have objected to any reference of Mims's K2 use, and assuming that the trial court should have prohibited any mention of K2, we nonetheless find no prejudice in this case. Contrary to Mims's assertion, his convictions do not arise from the evidence of him having smoked K2; the convictions are a result of the victims' testimony of the abuse and his own statements recorded in the jailhouse calls. We find no reasonable probability that but for counsel's errors, the proceeding's result would have been different.

**{¶65}** The second assignment of error is overruled.

**{¶66}** Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MARY J. BOYLE, ADMINISTRATIVE JUDGE

KENNETH A. ROCCO, J., and
EILEEN A. GALLAGHER, J., CONCUR