[Cite as *State v. Harris*, 2023-Ohio-3994.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                  :

        Plaintiff-Appellant/          :                    No. 21AP-678
        Cross-Appellee,                                   No. 22AP-124
                                      :                    (C.P.C. No. 20CR-3034)

v.                                             :
                                      :                    (REGULAR CALENDAR)

Terrence E. Harris,                            :

        Defendant-Appellee/
        Cross-Appellant.              :

                                      :

D E C I S I O N

Rendered on November 2, 2023

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Mark R. Wilson* for State of Ohio.

**On brief:** *Carpenter Lipps & Leland LLP,* and *Kort Gatterdam* for Terrence E. Harris.

APPEALS from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} This is a consolidated appeal from the judgment of conviction entered by the Franklin County Court of Common Pleas against Terrence E. Harris after a jury found him guilty of aggravated burglary and the trial court sentenced him to nine years in prison.

{¶ 2} Plaintiff-appellant/cross-appellee, the State of Ohio, asserts on appeal that the definite prison term imposed was contrary to law. Specifically, the state challenges the trial court's judgment declaring the indefinite sentencing provisions enacted through 2018 Am.Sub.S.B. 201 (the "Reagan Tokes Law") to be unconstitutional and argues the trial court committed reversible error when it imposed a definite prison sentence instead.

{¶ 3}   On cross-appeal, Mr. Harris argues his conviction is not supported by sufficient evidence and was against the manifest weight of the evidence.  He also attributes error to the trial court's evidentiary rulings at his November 2021 jury trial, and further contends he was deprived of the effective assistance of counsel at that trial.

{¶ 4}   Because Mr. Harris's four-cross assignments of error are not well-taken and the Supreme Court of Ohio recently held the Reagan Tokes Law is constitutional, we vacate Mr. Harris's nine-year prison sentence and remand the matter for resentencing consistent with the Reagan Tokes Law.

## I.  PROCEDURAL BACKGROUND

{¶ 5}   On July 7, 2020, a Franklin County Grand Jury returned a three-count indictment charging Mr. Harris with aggravated burglary, felonious assault, and kidnapping.   Because of his prior criminal convictions, repeat violent offender specifications were included with each count.  All offenses involved Mr. Harris's on-again, off-again girlfriend of four years, L.A., and were alleged to have occurred at the home of L.A.'s friend, D.D., in the early morning of June 24, 2020.

{¶ 6}   Trial commenced on November 2, 2021.  Two days later, the jury returned its verdict finding Mr. Harris guilty of aggravated burglary, and not guilty of felonious assault and kidnapping.  (Nov. 4, 2021 Tr. Vol. IV at 638-42.)  The trial court ordered Mr. Harris to undergo a pre-sentence investigation and advised trial counsel he would address the repeat violent offender specification included with the aggravated burglary count at sentencing.  (Tr. Vol. IV at 643-44.)

{¶ 7}   At the December 3, 2021 sentencing hearing, the parties stipulated to Mr. Harris's prior burglary conviction and, pursuant to R.C. 2941.149(B), the trial court determined Mr. Harris was a repeat violent offender.  (Dec. 3, 2021 Tr. Vol. V at 665-67.)  In addition to counsel, L.A. and Mr. Harris addressed the trial court before sentence was imposed.  (Tr. Vol. V at 670-83.)

{¶ 8}   Aggravated burglary qualifies as a first-degree felony offense subject to indefinite sentencing under the Reagan Tokes Law.  *See* 2018 Am.Sub.S.B. No. 201 (effective March 22, 2019).  As discussed more below, the Reagan Tokes Law requires a sentencing court to impose an indefinite sentence consisting of a minimum and a maximum prison term on individuals convicted of first- or second-degree felonies for which life

imprisonment is not an available sentence. *State v. Hacker*, _____ Ohio St.3d _____, 2023-Ohio-2535, ¶ 7, citing R.C. 2929.14(A)(1)(a) and (2)(a). Life imprisonment is not an available sentence for an aggravated burglary offense. *See* R.C. 2911.11; R.C. 2929.14.

{¶ 9} At the sentencing hearing, however, the trial court noted it had previously found the Reagan Tokes Law to be unconstitutional on the grounds cited in *State v. Hursey*, Franklin C.P. No. 20 CR 004459, 2021 Ohio Misc. LEXIS 101 (Aug. 6, 2021). (Tr. Vol. V at 686.) And, the court expressly adopted and incorporated that finding into its sentencing determination in this case. (*See* Jan. 3, 2022 Am. Jgmt. Entry at 2.) The trial court therefore sentenced Mr. Harris to a **definite** prison term of nine years for the aggravated burglary offense.[1] (Tr. Vol. V at 687. *See also* Am. Jgmt. Entry.) We note that, at the time of sentencing, neither this court nor the Supreme Court of Ohio had ruled on the constitutionality of the Reagan Tokes Law. Thus, at the conclusion of the sentencing hearing, the state noted its objection to the trial court's unconstitutionality determination and imposition of a definite prison sentence for the record. (Tr. Vol. V at 689-90.)

{¶ 10} On December 15, 2021, the state timely appealed from the judgment of conviction and asserts the following sole assignment of error for our review:

> THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO SENTENCE [MR. HARRIS] IN COMPLIANCE WITH S.B. 201, THE REAGAN TOKES ACT, AS REQUIRED BY ORC 2929.144 AND, THEREFORE, THE SENTENCE IS CONTRARY TO LAW.

{¶ 11} On February 23, 2022, Mr. Harris requested leave from this court to file a delayed cross-appeal pursuant to App.R. 5. We granted the motion on April 14, 2022. Mr. Harris raises the following four cross-assignments of error for our review:

> [I.] THE TRIAL COURT VIOLATED [MR. HARRIS'S] RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND AGAINST THE MANIFEST WEIGHT OF THE

---

[1] At the December 3, 2021 sentencing hearing, Mr. Harris also entered a plea of guilty to the stipulated lesser-included offense of attempted drug possession, a felony of the fifth degree, in case No. 20CR-2106. (Tr. Vol. V at 647-49.) In that case, the trial court imposed a 12-month prison sentence and ordered it be served concurrently with the 9-year prison sentence imposed in case No. 20CR-3034. (Tr. Vol. V at 688.) Neither party appeals from the final judgment entered in case No. 20CR-2106, and we find it has no relevance to our analysis of the issues before us in this appeal.

EVIDENCE IN VIOLATION OF [MR. HARRIS'S] RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

[II.] THE TRIAL COURT ERRED IN ADMITTING THE ALLEGED VICTIM'S NARRATIVE STATEMENT TO THE FORENSIC NURSE EXAMINER THEREBY VIOLATING [MR. HARRIS'S] RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL AS GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

[III.] THE STATE OF OHIO FAILED TO COMPLY WITH RULE 16(K) OF THE OHIO RULES OF CRIMINAL PROCEDURE BY FAILING TO TIMELY PROVIDE A SUMMARY OF QUALIFICATIONS OF ITS EXPERT WITNESS, AND THE TRIAL COURT SUBSEQUENTLY ERRED AND ABUSED ITS DISCRETION IN ALLOWING THE STATE'S EXPERT TO TESTIFY CONTRARY TO CROSS-APPELLANT'S CONSTITUTIONAL RIGHTS TO DUE PROCESS AND TO A FAIR TRIAL.

[IV.] [MR. HARRIS] WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL IN VIOLATION OF [HIS] RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION[S] 10 AND 16, ARTICLE I OF THE OHIO CONSTITUTION.

{¶ 12} Mr. Harris's four cross-assignments of error all pertain to trial-related matters, any of which could, if sustained, render the state's sole assignment of error challenging the propriety of the definite sentence imposed moot. For this reason, we first address Mr. Harris's four cross-assignments of error. And because Mr. Harris attributes error to a wide range of trial matters, the relevant facts are summarized within our analysis of each cross-assignment of error.

## II. ANALYSIS OF MR. HARRIS'S CROSS-ASSIGNMENTS OF ERROR

### A. First Cross-Assignment of Error

{¶ 13} In his first cross-assignment of error, Mr. Harris contends the evidence at trial was insufficient to support his aggravated burglary conviction. He also argues his aggravated burglary conviction was against the manifest weight of the evidence. We disagree.

### 1. Controlling Law and Standard of Review

{¶ 14} The issue of whether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at

trial. *See, e.g., State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 16; *State v. Frazier*, 10th Dist. No. 05AP-1323, 2007-Ohio-11, ¶ 7; *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). We do not weigh the evidence but instead determine " 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. We essentially assume the state's witnesses testified truthfully and determine if that testimony and any other evidence presented at trial satisfies each element of the crime. *State v. Watkins*, 10th Dist. No. 16AP-142, 2016-Ohio-8272, ¶ 31, quoting *State v. Hill*, 10th Dist. No. 07AP-889, 2008-Ohio-4257, ¶ 41. Thus, evidence is sufficient to support a conviction where, if believed, that evidence would allow any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt. *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

{¶ **15**} In contrast, a manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *See, e.g., State v. Richey*, 10th Dist. No. 17AP-260, 2018-Ohio-3498, ¶ 50, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 11-13, citing *Thompkins* at 386-87. "Although evidence may be sufficient to sustain a guilty verdict, the issue of manifest weight requires a different type of analysis." *State v. Walker*, 10th Dist. No. 02AP-679, 2003-Ohio-986, ¶ 43. "[W]eight of the evidence" concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Petty*, 10th Dist. No. 15AP-950, 2017-Ohio-1062, ¶ 60, citing *State v. Boone*, 10th Dist. No. 14AP-87, 2015-Ohio-2648, ¶ 49, citing *Thompkins* at 387.

{¶ **16**} When considering an appellant's claim that a conviction is against the manifest weight of the evidence, we sit as a "thirteenth juror" and may disagree "with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). *See also State v. Martin*, 170 Ohio St.3d 181, 2022-Ohio-4175, ¶ 26. In making this determination, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a

new trial ordered. *See, e.g., Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 10; *Eastley* at ¶ 20; *Thompkins* at 387; *Martin* at ¶ 26.

{¶ 17} Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See, e.g., State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus; *Morris v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 20AP-131, 2021-Ohio-3803, ¶ 64, citing *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. No. 11AP-606, 2012-Ohio-1017, ¶ 31, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at 80.

{¶ 18} To reverse a jury verdict as being against the manifest weight of the evidence, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required pursuant to Article IV, Section 3(B)(3) of the Ohio Constitution. *Bryan-Wollman v. Domonko*, 115 Ohio St.3d 291, 2007-Ohio-4918, ¶ 2-4, citing *Thompkins* at paragraph four of the syllabus.

### 2. Analysis

{¶ 19} Mr. Harris was convicted of aggravated burglary under R.C. 2911.11(A)(1), which provides:

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, if * * * [t]he offender inflicts, or attempts or threatens to inflict physical harm on another.

{¶ 20} The incident giving rise to this case occurred on the morning of June 24, 2020 at the home of L.A.'s childhood friend, D.D. (Nov. 2, 2021 Tr. Vol. II at 247-48, 324-25.) Specifically, the indictment alleged that the "occupied structure" in which Mr. Harris had trespassed was D.D.'s house, that the trespass occurred when D.D. was present, and that Mr. Harris "attempted or threatened to inflict physical harm on" L.A. while he was inside of D.D.'s home on June 24, 2020. (July 7, 2020 Indictment at 1.)

{¶ 21} On appeal, Mr. Harris does not dispute that D.D.'s house was an "occupied structure." *See* R.C. 2911.11(C)(1); R.C. 2909.01(C). Nor does he deny entering D.D.'s home on June 24, 2020. Instead, he contends the evidence presented at trial did not adequately prove he used force to enter D.D.'s home or that he had a purpose to commit a crime while inside. (Brief of Cross-Appellant at 18.) As described below, these two essential elements of the aggravated burglary offense were generally established through the testimony of D.D. and L.A., photographs taken by detectives of the apartment and L.A.'s injuries, and DNA evidence.

{¶ 22} Testimony at trial established that, after spending the evening hanging out with D.D. and her family at D.D.'s home on June 23, 2020, L.A. slept over in an upstairs bedroom that night. (*See* Tr. Vol. II at 246-47, 326-27.) Of note, L.A. is the godmother of D.D.'s two young daughters. (Tr. Vol. II at 247.) We also note that, at the time of the incident, D.D. considered Mr. Harris to be a friend, had known him for a couple of years, and knew he and L.A. had a romantic history. (Tr. Vol. II at 326.) Indeed, at the time of the incident, Mr. Harris and L.A. were nearing the end of their on-again, off-again relationship of four years, which L.A. testified ultimately ended around November 2020. (*See* Tr. Vol. II at 244.)

{¶ 23} D.D. testified that Mr. Harris came into her home on the morning of June 24, 2020 without permission while D.D. and her boyfriend were asleep in one upstairs bedroom and L.A. and D.D.'s two children were sleeping in another upstairs bedroom. (Tr. Vol. II at 328-30. *See also* Tr. Vol. II at 247-48, 253.) L.A. and D.D. both recounted awaking to someone loudly banging on the front door and then hearing a "big boom." (Tr. Vol. II at 248-49, 330-33.) Although neither saw Mr. Harris at the door, D.D. testified that she knew it was Mr. Harris because, after the banging commenced, she looked outside of her bedroom window and saw what she knew to be Mr. Harris's car parked outside. (Tr. Vol. II at 330-31.)

{¶ 24} Based on what they heard, D.D. and L.A. both surmised that Mr. Harris entered the house by kicking the front door in. (Tr. Vol. II at 248, 332-33.) Their testimony was corroborated by photographs taken by Columbus Police Department ("CPD") Detective Wayne Wright, who responded to the scene later that same day. (*See* Tr. Vol. II at 364-68.) A photograph of the front door's cracked door frame was presented and admitted as an

exhibit at trial. (State's Ex. A-3; Tr. Vol. II at 340-41, 368-69. *See also* Nov. 3, 2021 Tr. Vol. III at 536.) And, D.D. testified that she had to get her front door repaired after Mr. Harris kicked it down and split its frame. (*See* Tr. Vol. II at 341-42.)

{¶ 25} D.D. attested she had not given Mr. Harris permission to enter her home that day, and confirmed Mr. Harris did not have a key and was not on the lease for the house. (*See* Tr. Vol. II at 339-41.) L.A. also confirmed she did not permit or ask Mr. Harris to come into D.D.'s home that day. (Tr. Vol. II at 313-14.) Thus, the testimony of D.D. and L.A., if believed, sufficiently established that Mr. Harris used force to trespass in D.D.'s home on June 24, 2020. This is particularly true when taken in conjunction with Detective Wright's photographs of the cracked front door frame. For these reasons, Mr. Harris's contention that he "did not use force to enter" D.D.'s home is not well-taken.

{¶ 26} Mr. Harris also contends on appeal that the state failed to prove he had a purpose to commit a crime once he entered D.D.'s home. (*See* Brief of Cross-Appellant at 15-18; Reply Brief of Cross-Appellant at 2-4.) But, his argument is likewise unsupported by the record.

{¶ 27} After Mr. Harris kicked in the front door, D.D. testified that she heard—and then saw—Mr. Harris come up the stairs. (Tr. Vol. II at 333.) Of note, Mr. Harris never claimed that person was not him. When Mr. Harris came upstairs, L.A. was hiding in the closet of one of the upstairs bedrooms. (Tr. Vol. II at 248-49, 332-33.) At some point, D.D. confronted Mr. Harris, and Mr. Harris asked her where L.A. was. (*See* Tr. Vol. II at 249, 333.) D.D. did not respond, so Mr. Harris went to look for L.A. himself. (Tr. Vol. II at 333. *See also* Tr. Vol. II at 249.) L.A. left the closet to grab her phone so she could call the police. (Tr. Vol. II at 249-50.) However, Mr. Harris saw L.A. in the upstairs bedroom before she was able to place that call. (*See* Tr. Vol. II at 250.)

{¶ 28} L.A. testified that Mr. Harris "grabbed [her] by [her] arm * * * and threw [her] against the TV and TV stand and the closet." (Sic.) (Tr. Vol. II at 250.) Next, she testified, Mr. Harris "choked [her] and then picked [her] up and threw [her] back into the TV and the stand." (Tr. Vol. II at 250-51.) L.A. recounted thinking at that moment she was "going to die because he was choking me." (Tr. Vol. II at 251.) But instead, L.A. briefly blacked out and then regained consciousness while Mr. Harris was still choking her. (Tr. Vol. II at 251.) L.A. described Mr. Harris ordering her to leave D.D.'s home with him, and, when she

refused, L.A. testified that Mr. Harris hit her, grabbed her by the hair, dragged her down the steps, and directed her to get into his vehicle. (Tr. Vol. II at 251-53.) Ultimately, she complied. (Tr. Vol. II at 253, 338-39.)

{¶ 29} D.D. testified at trial about seeing Mr. Harris repeatedly hit and punch L.A. in the face while Mr. Harris and L.A. were still in the upstairs bedroom. (Tr. Vol. II at 334-35.) However, because her two young daughters were in the bedroom while the assault was ongoing, D.D.'s focus was on getting her two children out of that room and downstairs to safety. (Tr. Vol. II at 335-36.) D.D. also confirmed seeing Mr. Harris drag L.A. out of the bedroom and down the steps by her hair. (Tr. Vol. II at 337-38.) And, she recounted hearing Mr. Harris tell L.A. he would not leave without her. (Tr. Vol. II at 338.)

{¶ 30} Ultimately, this incident was reported to law enforcement after L.A. convinced Mr. Harris to take her to the emergency room later in the afternoon of June 24, 2020 because she was having trouble breathing. (Tr. Vol. II at 255-56.) L.A. testified that although she promised Mr. Harris she would not disclose that he caused her injuries, she ultimately gave the nurse a note reporting that he did. (Tr. Vol. II at 256-58.) Significantly, Detective Wright testified that, in his experience as a domestic violence investigator, it is not uncommon for a domestic violence victim to go straight to the hospital after an assault has happened rather than calling 911 while it is ongoing. (*See* Tr. Vol. II at 373.)

{¶ 31} After disclosing the assault to a nurse at the hospital, L.A. was interviewed by Detective Wright (Tr. Vol. II at 364-66) and examined by forensic nurse Lauren Wood (Tr. Vol. III at 450-69) while she was still at the hospital.

{¶ 32} Detective Wright photographed L.A.'s injuries "[t]o show she had been strangled[,]" and testified at trial about observing "some marks on [L.A.'s] neck." (Tr. Vol. II at 366, 372.) Those photographs were presented at trial as State's Exhibits A-7 through A-9. (Tr. Vol. II at 371-73.) After speaking with L.A. at the hospital, Detective Wright and other officers went to D.D.'s home to speak with other witnesses and to document the crime scene itself. (Tr. Vol. II at 366-67.) His crime scene photographs were presented at trial as State's Exhibits A-1 through A-6. (Tr. Vol. II at 367-71.)

{¶ 33} As part of her forensic examination, Nurse Wood took a narrative statement from L.A., collected DNA evidence from L.A. for the forensic kit, conducted a physical exam of L.A., and took photographs of L.A.'s injuries. (*See* Tr. Vol. III at 454-60.) Nurse Wood's

forensic report was presented at trial as State's Exhibit C and her photographs as State's Exhibits B-1 through B-14. (Tr. Vol. III at 452-56, 460-64.)

{¶ 34} We note that the narrative statement L.A. provided to Nurse Wood at the hospital on June 24, 2020 was generally consistent with L.A. and D.D.'s testimony at trial over a year later. The narrative statement indicates that L.A. described Mr. Harris kicking in the front door; running up the stairs to look for L.A.; choking, punching, and kicking L.A.; ordering L.A. to leave with him; and pulling L.A. down the stairs. (State's Ex. C at 3.) Nurse Wood testified about the unredacted narrative statement at trial (Tr. Vol. III at 455-56) and confirmed that L.A. reported losing consciousness during the incident (Tr. Vol. III at 465). Also significant were Nurse Wood's observations of bruising and abrasions on both sides of L.A.'s neck, facial swelling, petechia to L.A.'s eyes, dried blood in L.A.'s left ear, bruising on L.A.'s left rib cage, and abrasions on L.A.'s left shoulder—about which Nurse Wood testified at trial. (*See* State's Ex. C at 4-8; Tr. Vol. III at 460-65. *See also* State's Exs. B-1 through B-14.) Nurse Wood also collected DNA samples from the left side of L.A.'s neck and the right side of her face for the medical forensic kit. (State's Ex. C at 4; Tr. Vol. III at 465-69.)

{¶ 35} On March 4, 2021, law enforcement obtained a DNA sample from Mr. Harris. (Tr. Vol. III at 524.) Thereafter, the DNA samples from the medical forensic kit performed on L.A. were submitted to CPD's crime lab for comparison with Mr. Harris's DNA sample. (State's Ex. E. *See* Tr. Vol. III at 521-31.) Ultimately, the CPD crime lab issued a report finding the male DNA profile included in the sample collected from the left side of L.A.'s neck to be consistent with Mr. Harris's DNA standard. (Tr. Vol. III at 529-30. *See also* State's Ex. E.) The male DNA profile included in the sample collected from L.A.'s right cheek was not of sufficient quantity or quality for comparison purposes, however. (Tr. Vol. III at 530-31.)

{¶ 36} Although Mr. Harris may not have intended to commit a criminal offense when he went to D.D.'s house—or even when he initially broke into the house through the front door—the state's evidence, if believed, established that Mr. Harris formed the intent to commit the criminal offense of assault during the trespass. In *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, the Ohio Supreme Court held that for purposes of the offense of aggravated burglary, the intent to commit a separate criminal offense may be formed

during the trespass. *Id.* at ¶ 33, citing *State v. Fontes*, 87 Ohio St.3d 527 (2000), syllabus (holding that to be guilty of aggravated burglary, "a defendant may form the purpose to commit a criminal offense at any point during the course of a trespass"). This remains true irrespective of the fact that the jury found Mr. Harris not guilty of the felonious assault and kidnapping offenses also charged by the state. And, we note the jury instructions indicated that felonious assault, kidnapping, and/or assault were the "criminal offenses at issue." (Tr. Vol. III at 610-11.)

**{¶ 37}** After reviewing the record, we find the state's evidence, if believed, sufficiently established that during the trespass—after Mr. Harris broke into D.D.'s house by kicking in the front door—Mr. Harris formed the intent to assault L.A., and did, in fact, assault L.A. Accordingly, the state established that Mr. Harris trespassed in D.D.'s home, an occupied structure where L.A., D.D., and others were sleeping, with the purpose of committing the criminal offense of assault, and inflicted physical harm—defined by R.C. 2901.01(A)(3) as "any injury, illness, or other physiological impairment, regardless of its gravity or duration"—on L.A., as required to support an aggravated burglary conviction under R.C. 2911.11(A)(1).

**{¶ 38}** Having found his sufficiency challenge to be without merit, we next turn to Mr. Harris's contention that his aggravated burglary conviction was against the manifest weight of the evidence.

**{¶ 39}** In support of that challenge, Mr. Harris contends that L.A. and D.D. were not credible witnesses for a number of reasons, and generally posits that their testimony—provided more than a year after the incident—featured many inconsistencies. (Brief of Cross-Appellant at 14-18.) He further suggests the jury made inconsistent determinations about their credibility because it found him not guilty of the felonious assault and kidnapping offenses, but guilty of the aggravated burglary offense. (Brief of Cross-Appellant at 18.) But, the state was only required to prove Mr. Harris inflicted (or attempted or threatened to inflict) "physical harm," as defined by R.C. 2901.01(A)(3), on L.A. to sustain the aggravated burglary conviction. R.C. 2911.11(A)(1). In contrast, both the kidnapping and felonious assault offenses Mr. Harris was charged with required proof of "serious physical harm," as defined by R.C. 2901.01(A)(5), which is markedly different. *See*

R.C. 2905.01(A)(3); R.C. 2903.11(A)(1).  For this reason, Mr. Harris's contention that the jury made inconsistent determinations is not well-taken.

{¶ 40} Turning to Mr. Harris's credibility arguments, we first acknowledge that there were minor inconsistencies between the testimony presented at trial.  For instance, where D.D. was standing when Mr. Harris entered the home and how long the entire incident lasted.  (*See* Brief of Cross-Appellant at 15-16.)  But, even though conflicting testimony was presented at trial, a defendant "is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented."  *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 29.  *See also State v. J.E.C.*, 10th Dist. No. 12AP-584, 2013-Ohio-1909, ¶ 42.

{¶ 41} It is well-established that a jury may consider conflicting testimony from a witness in determining credibility and the persuasiveness of the account by either discounting or otherwise resolving the discrepancies.  *See, e.g.*, *State v. Taylor*, 10th Dist. No. 14AP-254, 2015-Ohio-2490, ¶ 34, citing *Midstate Educators Credit Union, Inc. v. Werner*, 175 Ohio App.3d 288, 2008-Ohio-641, ¶ 28 (10th Dist.).  " 'The finder of fact can accept all, part or none of the testimony offered by a witness, whether it is expert opinion or eyewitness fact, and whether it is merely evidential or tends to prove the ultimate fact.' " *Petty*, 2017-Ohio-1062 at ¶ 63, quoting *State v. Mullins*, 10th Dist. No. 16AP-236, 2016-Ohio-8347, ¶ 39.  *See also State v. Mann*, 10th Dist. No. 10AP-1131, 2011-Ohio-5286, ¶ 37, quoting *State v. Nivens*, 10th Dist. No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, *7 (May 28, 1996) (" 'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' ").

{¶ 42} Based on our review of the record, we conclude that D.D.'s testimony, L.A.'s testimony, photographic evidence, medical evidence, and DNA evidence presented at trial were consistent in many material respects.  The state's evidence credibly and consistently established that Mr. Harris forcibly broke into D.D.'s house through the front door without permission and while others were present, looked for L.A. upon his entry, and assaulted L.A. while he was inside of the home.  On appeal, Mr. Harris does not contend the state's evidence was inconsistent in any of these key respects.

{¶ 43} We also recognize that some evidence presented at trial could have cast doubt upon the credibility of L.A. and/or D.D. The record reflects, however, that Mr. Harris's trial counsel presented these credibility concerns to the jury through his cross-examination of multiple witnesses at trial. He called into question the memories of L.A. and D.D. by pointing out they had been drinking the night before. (Tr. Vol. II at 307, 344-46. *See* Brief of Cross-Appellant at 14, 17.) More narrowly, Mr. Harris's trial counsel attacked L.A.'s credibility by emphasizing L.A.'s alcohol dependency—likely related to her untreated PTSD from military service—to which, we note, L.A. freely admitted. (Tr. Vol. II at 277-78, 305-08, 345-48, 357-58. *See* Brief of Cross-Appellant at 14, 17.) L.A. conceded she had been drinking the night before the incident and acknowledged she did not remember, at the time of trial, all conversations—including text message exchanges between Mr. Harris and L.A.— that took place in the hours preceding the June 24, 2020 incident (Tr. Vol. II at 306-08). But, L.A. also unequivocally testified she was not impaired when the incident occurred on the morning of June 24, 2020. (Tr. Vol. II at 313.)

{¶ 44} Mr. Harris also cites to D.D. and L.A.'s failure to call 911 during the incident to suggest their testimony about the incident was false. (*See* Brief of Cross-Appellant at 15-17.) But there are many other reasons a person may not call 911—including, as Detective Wright recognized, in domestic violence situations like this (*see* Tr. Vol. III at 373)—and any implication about the import of such failure is ultimately undermined by the fact that L.A. went to the hospital later that same day and reported the assault.

{¶ 45} " '[W]here a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding * * * as being against the manifest weight of the evidence.' " *In re L.J.*, 10th Dist. No. 11AP-495, 2012-Ohio-1414, ¶ 21, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26. The jury, as trier of fact, was in the best position to consider the discrepancies in the testimony regarding the events that took place on June 24, 2020. The jury was also in the best position to evaluate the credibility of L.A. and D.D.'s testimony about Mr. Harris's actions. The jury was likewise free to reject the implication by Mr. Harris's trial counsel that L.A. and D.D. were not credible witnesses or otherwise failed to provide truthful testimony.

{¶ 46} The balance of Mr. Harris's arguments in support of his first cross-assignment of error generally pertain to the absence of evidence that might be expected at trial. He takes issue with detectives' failure to collect evidence from L.A.'s phone regarding conversations she had with Mr. Harris prior to his arrival at D.D.'s home. (Brief of Cross-Appellant at 14.) Setting aside the speculative nature of this evidence, it follows that Mr. Harris would have had access to the same messages on his phone, yet those were not produced by his counsel as evidence at trial. Mr. Harris also speculates about whether the front door had pre-existing damage, but that speculation does not refute the testimony about Mr. Harris repeatedly banging on the door and entering D.D.'s home without permission. (*See* Brief of Cross-Appellant at 15.) Mr. Harris also conjectures that because L.A. sustained only minor injuries—when more serious injuries would be expected from L.A.'s description of events—her credibility was somehow undermined. (Brief of Cross-Appellant at 17-18.) But, the absence of expected evidence is not compelling when it comes to our evaluation of the manifest weight challenge Mr. Harris makes on appeal.

{¶ 47} To assess the credibility of the state's witnesses and evidence, the jury, as the trier of fact, had sufficient information about the factual inconsistencies, use of alcohol the night before the incident, L.A.'s history with alcohol, and the relationship between D.D., L.A., and Mr. Harris. Mr. Harris's defense counsel also emphasized the absence of evidence one might expect would be presented in this type of case. While Mr. Harris did not testify, the defense's theories at trial were that (1) L.A. asked Mr. Harris to pick her up from D.D.'s home but she was too drunk to remember (*see* Tr. Vol. II at 284-85, 302, 306-08); (2) Mr. Harris came to D.D.'s home to retrieve L.A. because L.A. told him she had been drinking and Mr. Harris knew she should not be (*see* Tr. Vol. II at 346-48); (3) Mr. Harris was actually invited inside D.D.'s home and D.D.'s front door frame was damaged prior to his arrival (*see* Tr. Vol. II at 342-47); (4) at least some of L.A.'s injuries were pre-existing (*see* Tr. Vol. II at 302-04), L.A. and Mr. Harris had a history of physicality between them (*see* Tr. Vol. II at 349); and (5) L.A.'s injuries were not traumatic or serious (*see* Tr. Vol. II at 303-05, 348-57). Ultimately, the jury did not find Mr. Harris's theories compelling enough to render a not guilty verdict on the aggravated burglary offense.

{¶ 48} After reviewing the record and for the reasons set forth above, we cannot say this is one of the rare cases where the trier of fact clearly lost its way in believing the

testimony of D.D. and L.A. when it found Mr. Harris guilty of aggravated burglary. Accordingly, we conclude Mr. Harris's conviction is not against the manifest weight of the evidence.

{¶ 49}  For these reasons, Mr. Harris's first cross-assignment of error is overruled.

## B.  Second Cross-Assignment of Error

{¶ 50}  In his second cross-assignment of error, Mr. Harris contends the trial court erred in allowing Nurse Wood to read into the record the unredacted narrative statement L.A. provided at the hospital on June 24, 2020.  When the trial prosecutor asked Nurse Wood to read this narrative statement during her direct examination testimony, Mr. Harris's trial counsel "object[ed] to it as hearsay." (Tr. Vol. III at 454.)  The trial prosecutor conceded it was hearsay but contended that because it contained statements made by L.A. to Nurse Wood for purposes of medical diagnosis or treatment, the narrative statement in Nurse Wood's forensic report was admissible under the hearsay exception provided in Evid.R. 803(4).  (Tr. Vol. III at 454-55.)  Mr. Harris's trial counsel did not argue otherwise, so the trial court permitted Nurse Wood to read the entire unredacted narrative statement during her trial testimony.  (*See* Tr. Vol. III at 454-56.)  It stated as follows:

> I woke up at a friend's house to someone banging on the door, then you could hear someone kicking the door and it was him. Clarified as Terrence. He kicked in the door. He ran up the steps looking for me, but I hid in the closet. I heard him arguing with my friend and her boyfriend so I came out so that's when he started assaulting me, punching me, choking me, kicking me. He said, let's go. I said[,] I'm not going with you[,] so he pulled me down the steps. To diffuse the situation outside I went and got in the back seat. Then went to my house. My house was destroyed. He kicked in my door as well. The TVs were all the - - off the wall, I couldn't find my iPad. I said, where is my iPad? He said[,] I got everything that's valuable to you. I said, I need to go to the emergency room I'm having a panic attack and that's when he brought me here.

(Tr. Vol. III at 455-56.)

{¶ 51}  At the close of the state's case, the trial court reviewed the state's proffered trial exhibits.  (*See* Tr. Vol. III at 536-40.)  At that time, the trial prosecutor conceded that not all statements contained in the narrative statement from Nurse Wood's forensic report were admissible as statements for purposes of medical diagnosis or treatment under

Evid.R. 803(4). (*See* Tr. Vol. III at 537-38.) Thus, the state offered to redact the following sentences from the forensic report, which was presented as State's Exhibit C:

> Then went to my house. My house was destroyed. He kicked in my door as well. The TVs were all the - - off the wall, I couldn't find my iPad. I said, where is my iPad? He said[,] I got everything that's valuable to you.

(Tr. Vol. III at 455-56. *Compare* Tr. Vol. III at 536-37, *with* State's Ex. C.)

{¶ 52} Significantly, Mr. Harris's trial counsel approved those redactions and indicated he had no objection to the trial court's admission of State's Exhibit C—Nurse Wood's forensic report containing the redacted narrative statement provided by L.A. (Tr. Vol. III at 537.)

### 1. Scope of Review

{¶ 53} Before analyzing the admissibility of this evidence, we must outline the scope of our review. On appeal, Mr. Harris asserts the trial court erred and abused its discretion by permitting Nurse Wood to read the unredacted narrative statement during her trial testimony and in admitting the redacted narrative statement as State's Exhibit C. He generally contends the narrative statement should have been excluded from trial because it contained statements that could not be attributed to medical treatment or diagnosis and was therefore inadmissible hearsay, was needlessly cumulative, and/or improperly bolstered L.A.'s credibility. (Brief of Cross-Appellant at 19-24.)

{¶ 54} Mr. Harris's trial counsel did not raise or substantively address any of these specific grounds in the court below. Evid.R. 103(A)(1) requires that a party seeking to exclude evidence state "a timely objection or motion to strike * * * [that includes] the specific ground of objection, if the specific ground was not apparent from the context." *See also State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 80, citing *State v. Tibbetts*, 92 Ohio St.3d 146, 161 (2001), citing *State v. Mason*, 82 Ohio St.3d 144, 159 (1998). At trial, Mr. Harris's counsel timely objected to Nurse Wood reading the unredacted narrative statement from her forensic report, but only stated "hearsay" as the specific basis for his objection. (Tr. Vol. III at 454.) His trial counsel did not address the state's Evid.R. 803(4) hearsay exception argument in response to that objection and did not object to the

admission of the forensic report containing the redacted narrative statement as evidence at the close of trial.  (Tr. Vol. III at 536-37.)

{¶ 55} In any event, we nonetheless determine that the basis for Mr. Harris's objection to Nurse Wood's testimony reading from the unredacted narrative statement was impermissible hearsay.  But, Mr. Harris's failure to renew his objection to the admission of the redacted report forfeits all but plain error on appeal.  *See, e.g.*, *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 23.  Indeed, it is well-established that "[g]enerally, when a party fails to renew an objection at the time exhibits are admitted into evidence, that party waives the ability to raise the admission as error on appeal, unless plain error is shown." *Odita v. Phillips*, 10th Dist. No. 09AP-1172, 2010-Ohio-4321, ¶ 56, citing *Nicula v. Nicula*, 8th Dist. No. 84049, 2009-Ohio-2114.  *See also State v. Smith*, 80 Ohio St.3d 89, 107 (1997).

{¶ 56} Based on the foregoing, we conclude that Mr. Harris preserved error as to Nurse Wood's reading of the subsequently redacted sentences from the narrative statement contained in her report.  (*Compare* Tr. Vol. III at 455-56, *with* State's Ex. C and Tr. Vol. III at 536-37.)  But, he has forfeited all but plain error in regard to the remainder of the narrative statement, as well as the "needlessly cumulative" and "improper bolstering" issues he presents for the first time on appeal.

### 2. Inadmissible Hearsay Analysis

{¶ 57} Although L.A.'s narrative statement to Nurse Wood contained hearsay, the trial court concluded—without, the record suggests, first reviewing it—that the entire narrative statement was admissible under Evid.R. 803(4).  (*See* Tr. Vol. III at 454-56.)

{¶ 58} Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Hearsay is generally inadmissible unless an exception applies. Evid.R. 802.  Pertinent here, Evid.R. 803 excludes various items from the hearsay rule, "even though the declarant is available as a witness," including "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4). The term "medical diagnosis" in Evid.R. 803(4) includes both physical and

mental health diagnoses. *State v. R.L.R.*, 10th Dist. No. 18AP-971, 2020-Ohio-4577, ¶ 16, citing *In re S.A.*, 12th Dist. No. CA2017-07-092, 2017-Ohio-8792, ¶ 41. *See also State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 33-44.

{¶ 59} " '[Evid.R.] 803(4) encompasses statements made by persons who bring the patient to the hospital or doctor's office, as long as the third person's statements are in subjective contemplation of treatment or diagnosis. * * * Where, however, circumstances indicate the third [person] * * * is merely speculating as to facts relating to the injury, exclusion may be warranted since the essential element of reliability is not present.' " *State v. Thompson*, 2d Dist. No. 22984, 2010-Ohio-1680, ¶ 24, quoting Weissenberger, *Ohio Evidence Courtroom Manual* 583 (2008). *See also State v. Airwyke*, 11th Dist. No. 2006-T-0073, 2007-Ohio-3199, ¶ 21. The hearsay exception provided by Evid.R. 803(4) is limited to those statements made by the patient (or third party who brought the patient to the medical facility) that are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted. *State v. Boston,* 46 Ohio St.3d 108, 121 (1989).

{¶ 60} "[A] trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, [an appellate] court should be slow to interfere." *State v. Hymore*, 9 Ohio St.2d 122, 128 (1967). "The Ohio Supreme Court has held that the erroneous admission of inadmissible hearsay that is cumulative to properly admitted testimony constitutes harmless error." *Peffer v. Cleveland Clinic Found.*, 8th Dist. No. 94356, 2011-Ohio-450, ¶ 28, citing *State v. Williams*, 38 Ohio St.3d 346 (1988).

{¶ 61} In this case, the trial prosecutor recognized at the close of its case that portions of L.A.'s narrative statement to Nurse Wood—which were read by Nurse Wood during her direct examination—were not actually made for the purposes of seeking medical treatment or diagnosis. (*See* Tr. Vol. III at 536-37.) The specific statements identified by the trial prosecutor were as follows:

> Then went to my house. My house was destroyed. He kicked in my door as well. The TVs were all the - - off the wall, I couldn't find my iPad. I said, where is my iPad? He said[,] I got everything that's valuable to you.

(*Compare* Tr. Vol. III at 455-56, *with* State's Ex. C and Tr. Vol. III at 536-37.) For this reason, the trial prosecutor redacted these statements from Nurse Wood's forensic report before it was admitted as an exhibit at trial. (*See* Tr. Vol. III at 536-37; State's Ex. C.)

{¶ 62} On review, we agree that these statements were arguably not made for purposes of L.A.'s medical treatment and diagnosis. Thus, they were not admissible under Evid.R. 803(4). But even assuming the admission of such testimony was improper, we nonetheless find it does not rise to the level of prejudicial error. Mr. Harris's aggravated burglary conviction stemmed from his actions at D.D.'s home—not what was alleged to have transpired at L.A.'s home. (*See* Indictment.) Moreover, L.A. testified and was subject to cross-examination about the events which these statements concern. (*See* Tr. Vol. II at 255-57.) And, arguably, the first four sentences may have been otherwise admissible as other-acts evidence under Evid.R. 404(B) and the last sentence as a party-opponent admission under Evid.R. 801(D)(2) or statement against interest under Evid.R. 803(3).

{¶ 63} For these reasons, we conclude that—even if erroneous—Mr. Harris did not suffer material prejudice from the admission of this testimony given the facts and circumstances of this case.

### 3. Plain Error Analysis

{¶ 64} As to the remaining issues under Mr. Harris's second cross-assignment of error, we do not find plain error.

{¶ 65} Plain error is error that affects substantial rights. Crim.R. 52(B). For the plain error doctrine to apply, the party claiming error must establish (1) that " 'an error, i.e., a deviation from a legal rule' " occurred, (2) that the error was " 'an "obvious" defect in the trial proceedings,' " and (3) that this obvious error affected substantial rights, i.e., the error " 'must have affected the outcome of the [proceedings].' " *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). In determining whether plain error occurred, we must examine the alleged error in light of all of the evidence properly admitted at trial. *State v. Hill*, 92 Ohio St.3d 191, 203 (2001). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*, citing *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. *See also Schade v. Carnegie Body Co.*, 70 Ohio St.2d 207, 209 (1982) ("A 'plain error' is obvious and prejudicial although neither objected to nor affirmatively waived

which, if permitted, would have a material adverse [e]ffect on the character and public confidence in judicial proceedings").

{¶ 66} Even assuming the redacted narrative statement still contained some statements not made for purposes of medical treatment and diagnosis, any arguable error the trial court committed in admitting those statements was harmless and therefore did not affect Mr. Harris's substantial rights. *State v. Gardner*, 118 Ohio St.3d 420, 2008-Ohio-2787, ¶ 78. As Mr. Harris acknowledges in his appellate brief, the redacted narrative statement contained in Nurse Wood's forensic report simply repeated what L.A. stated during her direct in-court testimony at trial. (*See* Brief of Cross-Appellant at 22-23.) " 'Any error in the admission of hearsay is generally harmless where the declarant of the hearsay statement is cross-examined on the same matters and the seemingly erroneous evidence is cumulative in nature.' " *In re M.E.G.*, 10th Dist. No. 06AP-1256, 2007-Ohio-4308, ¶ 32, quoting *State v. Holloman*, 10th Dist. No. 06AP-01, 2007-Ohio-840, ¶ 2. L.A. testified at trial in open court and was subject to cross-examination. Thus, the jury had the opportunity to view the witness and to assess L.A.'s credibility. Accordingly, any arguable error that may have occurred in this case concerning the testimony of Nurse Wood and admission of her redacted forensic report was harmless and does not give rise to plain error.

{¶ 67} Mr. Harris further contends that, even if admissible, testimony and evidence about the redacted narrative statement was needlessly cumulative under Evid.R. 403(B) because L.A. "already testified as to what allegedly happened." (Brief of Cross-Appellant at 23.) Evid.R. 403(B) provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence." We note, however, that "Evid.R. 403(B) does not require exclusion of cumulative evidence. The court has discretion to admit or exclude it." *State v. Campbell*, 69 Ohio St.3d 38, 51 (1994). *See also State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, ¶ 59. Thus, the mere fact that evidence is repetitive does not rise to the level of reversible error unless "the defendant has been materially prejudiced thereby." *Id*. at ¶ 61. Because it is clear Mr. Harris's trial strategy was to attack L.A.'s credibility, we cannot say that L.A.'s prior consistent statements to Nurse Wood about her injuries were needlessly cumulative. Furthermore, they were clearly relevant evidence of the felonious assault offense for which Mr. Harris was also charged.

{¶ 68} We therefore do not believe the trial court erred by allowing the state to introduce cumulative evidence under the facts and circumstances of this case. But, even assuming it did, we cannot say the admission of this cumulative evidence materially prejudiced Mr. Harris.[2] Even without the narrative statement, there was overwhelming evidence of guilt as to the aggravated burglary offense. Both D.D. and L.A. testified they heard someone kick in D.D.'s front door, and photographic evidence of D.D.'s split door frame corroborated their account. Both D.D. and L.A. testified that Mr. Harris entered D.D.'s home, and Mr. Harris did not refute that claim at trial. Although Mr. Harris maintained he had been permitted to enter D.D.'s home, D.D. unequivocally testified otherwise. Furthermore, both D.D. and L.A. recounted Mr. Harris looking for L.A. immediately upon his entry into D.D.'s home and, upon finding her, assaulting L.A. inside of D.D.'s home. And, at trial, the state presented photographs, medical records, and medical testimony about the injuries L.A. presented with at the hospital.

{¶ 69} Accordingly, based upon the foregoing reasons, we overrule Mr. Harris's second cross-assignment of error.

### C. Third Cross-Assignment of Error

{¶ 70} In his third cross-assignment of error, Mr. Harris argues the trial court erred in allowing the state to present expert testimony from Nurse Wood because the state failed to timely provide Mr. Harris's trial counsel with a summary of Nurse Woods's qualifications, as required by Crim.R. 16(K).

### 1. Controlling Law and Standard of Review

{¶ 71} Crim.R. 16 governs discovery and inspection in criminal cases. When a discovery violation occurs, the trial court "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the

---

[2] Although Mr. Harris generally contends that it "constituted improper bolstering of the State's key witness[,] [L.A.,]" he does not cite to any authority to support his contention that the bolstering here was improper. (*See* Brief of Cross-Appellant at 23-24.) In fact, courts—including this one—have held that " '[a] party may introduce testimony to "bolster" or corroborate another witness's testimony as long as the testimony is relevant and not objectionable on specific evidentiary grounds.' " *State v. J.W.*, 10th Dist. No. 12AP-345, 2013-Ohio-804, ¶ 22, quoting *State v. Hurst*, 10th Dist. No. 98AP-1549, 2000 Ohio App. LEXIS 816 (Mar. 7, 2000). *See also State v. Culp*, 9th Dist. No. 26188, 2012-Ohio-5395, ¶ 30 (evidence corroborating victim's testimony is relevant to the victim's credibility).

circumstances." Crim.R. 16(L)(1). "A trial court must inquire into the circumstances surrounding a discovery rule violation and, when deciding whether to impose a sanction, must impose the least severe sanction that is consistent with the purpose of the rules of discovery." *Lakewood v. Papadelis*, 32 Ohio St.3d 1 (1987), paragraph two of the syllabus. Violations of Crim.R. 16 by the state constitute reversible error "only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." *State v. Joseph*, 73 Ohio St.3d 450, 458 (1995).

{¶ 72} A trial court has broad discretion over discovery matters, which means we review a trial court's ruling on a claimed discovery violation under Crim.R. 16 for an abuse of discretion. *State ex rel. Duncan v. Middlefield*, 120 Ohio St.3d 313, 2008-Ohio-6200, ¶ 27. "[A]buse of discretion connotes that the court's attitude is unreasonable, arbitrary or unconscionable." (Internal quotations omitted.) *State v. Weaver*, ___Ohio St.3d___, 2022-Ohio-4371, ¶ 24, quoting *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 60, quoting *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). "A decision is unreasonable if there is no sound reasoning process that would support the decision." (Internal quotations omitted.) *Fernando v. Fernando*, 10th Dist. No. 16AP-788, 2017-Ohio-9323, ¶ 7, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990). A decision is arbitrary if it is made "without consideration of or regard for facts [or] circumstances." (Internal quotations omitted.) *State v. Hill*, ___Ohio St.3d___, 2022-Ohio-4544, ¶ 9, quoting *State v. Beasley*, 152 Ohio St.3d 470, 2018-Ohio-16, ¶ 12, quoting *Black's Law Dictionary* 125 (10th Ed.2014). A decision may also be arbitrary if it lacks any adequate determining principle and is not governed by any fixed rules or standards. *See Beasley* at ¶ 12, citing *Dayton ex rel. Scandrick v. McGee*, 67 Ohio St.2d 356, 359 (1981), citing *Black's Law Dictionary* 96 (5th Ed.1979). *See also State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, ¶ 19. A decision is unconscionable if it "affronts the sense of justice, decency, or reasonableness." *Fernando* at ¶ 7, citing *Porter, Wright, Morris & Arthur, LLP v. Frutta Del Mondo, Ltd.*, 10th Dist. No. 08AP-69, 2008-Ohio-3567, ¶ 11.

{¶ 73} An abuse of discretion may also be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, ¶ 15 (8th Dist.). *See also New Asian Super Mkt. v. Jiahe Weng*, 10th Dist. No. 17AP-207, 2018-Ohio-1248, ¶ 16.

### 2. Analysis

{¶ 74} On the first day of trial, Mr. Harris's counsel informed the trial court that the state failed to provide him with a copy of Nurse Wood's curriculum vitae ("CV") 21 days prior to trial. (Nov. 1, 2021 Tr. Vol. I at 7.) Although Mr. Harris concedes on appeal that the state timely provided defense counsel with Nurse Wood's forensic report (Brief of Cross-Appellant at 29), he nonetheless argues that, pursuant to Crim.R. 16(K)'s mandatory language, the trial court was required to exclude Nurse Wood's testimony at trial due to the state's failure to timely produce her CV.

{¶ 75} Crim.R. 16(K) provides:

> An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications. The written report and summary of qualifications shall be subject to disclosure under this rule no later than twenty-one days prior to trial, **which period may be modified by the court for good cause shown, which does not prejudice any other party. Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial**.

(Emphasis added.)

{¶ 76} The purpose of Crim.R. 16(K) is to prevent "either party from avoiding pretrial disclosure of the substance of expert witness's testimony by not requesting a written report from the expert, or not seeking introduction of a report." Crim.R. 16(K), 2010 Staff Notes. In promoting "more open discovery" in criminal cases, Crim.R. 16(K)'s aim is to level the lopsided playing field by strengthening the defendant's right to know the evidence the state will present against him or her at trial. *See State v. Boaston*, 160 Ohio St.3d 46, 2020-Ohio-1061, ¶ 44.

**{¶ 77}** After defense counsel raised this issue at trial, the state did not dispute that it failed to provide defense counsel with Nurse Wood's CV in accordance with Crim.R. 16(K). (*See* Tr. Vol. I at 10.) But, the trial prosecutor pointed out that Mr. Harris's trial counsel timely received Nurse Wood's report and emphasized that, under the plain language of the rule, exclusion of an expert witness's testimony is only mandated when an expert's *report*—not CV—is not timely disclosed. (*See* Tr. Vol. I at 9-10.)

**{¶ 78}** To remedy the belated production of Nurse Wood's CV, the trial court suggested a 24-hour continuance. (Tr. Vol. I at 14.) But, in rejecting the trial court's proposal, Mr. Harris's trial counsel stated as follows:

> Your Honor, what I have in the report, and for the record, I do have the report and it's one that I would expect to be filled out as part of a medical examination. What I don't have is the qualifications. And I think, Your Honor, that an extra 24-hour period might allow me to review some of the qualifications that this nurse may have, but, Your Honor, my understanding that this is going to be a new sort of [forensic nursing] program that will be forthcoming.
>
> Your Honor, ***I don't think looking at her CV is going to drastically change my ability to counter anything she would say by way of a witness who might give a counterpoint,*** Your Honor, so no, I'm not asking for a delay for the Court's question. I don't think 24 hours is sufficient to help me.
>
> * * *
>
> Your Honor, to have an expert in the form of a nurse come in and start discussing very medical concepts ***particularly inasmuch as they pertained to strangulation***, the follow-up tests, to a severed artery, Your Honor, why someone would do that and why would they follow up with tests, that I can see, Your Honor, goes to the crux of my argument which is I believe she's looking at things that are specialized training that I can't begin to understand.
>
> Your Honor, the fact that I don't understand what a nurse says on a normal day either, I don't think precludes me from having her CV so that I can see specifically the training. Your Honor, my understanding is the state may even have in this case done some extra training in preparation for kind of a

different kind of testimony than we might have had in the past.

So, Your Honor, no, to the extent that the courts use the least restrictive remedy to a 16(K) violation, Your Honor, I don't believe a short delay with her CV would likely do that. I think only looking at it in the context of what this might be in the big picture and potentially having another witness that could give some more or differing analysis is what we would be looking for.

(Emphasis added.) (Tr. Vol. I at 14-17. *See also* Tr. Vol. II at 219; Tr. Vol. III at 429-30.)

{¶ 79} To address defense counsel's concerns about the inadequacy of a 24-hour trial continuance, the trial court postured that defense counsel could ask for a 22-day continuance as a remedy for the state's failure to timely produce Nurse Wood's CV. (Tr. Vol. I at 17.) But, Mr. Harris—who was incarcerated at the time of trial—told his trial counsel he did not wish to continue the scheduled trial. (Tr. Vol. I at 17.) The trial court deferred ruling on this issue at that time. (Tr. Vol. I at 18.)

{¶ 80} The state provided defense counsel with Nurse Wood's CV after the first day of trial ended and, we note, before any witnesses were called. (Tr. Vol. I at 215; Tr. Vol. III at 403.) The state called Nurse Wood as a witness on the third day of trial. (*See* Tr. Vol. III at 416.) Before she testified, however, defense counsel again argued that because the state failed to timely produce Nurse Wood's CV, Crim.R. 16(K) precluded her from testifying. (*See* Tr. Vol. III at 402-08.) Specifically, defense counsel explained that he anticipated Nurse Wood would "testify that she did a forensic examination that reveals specific things with regard to strangulation," and expressed concern about the state calling "a nurse who has forensic training specific to looking for signs or symptoms of strangulation" when he was not timely provided with her CV detailing her certification in this area. (*See* Tr. Vol. III at 404-05.) Mr. Harris's trial counsel emphasized his concern about the state "attempting to use [Nurse Wood's] testimony to make [the jury] look at this as potentially a life-threatening situation," which the defense pointed out was relevant to the "serious physical harm" element of both the felonious assault and kidnapping charges. (*See* Tr. Vol. III at 407-08.)

{¶ 81} Finding the plain language of Crim.R. 16(K) did not "require the express and particularized transmission of a [CV]," the trial court ultimately denied Mr. Harris's motion

to preclude Nurse Wood's testimony at trial.  (Nov. 2, 2021 Entry at 2.  *See also* Tr. Vol. II at 219; Tr. Vol. III at 410-11.)  More precisely, the trial court issued an entry modifying the disclosure period, pursuant to Crim.R. 16(K), and explaining its findings and reasoning in support of that decision.  (Nov. 2, 2021 Entry, citing *State v. Seitz*, 5th Dist. No. 14 CAA 10 00072, 2015-Ohio-3100.)

**{¶ 82}** We acknowledge the mandatory language of Crim.R. 16(K).  However, we need not reach the issue of whether a trial court's discretion remains when a party fails to "***disclose***" an expert's "***written report***," as contemplated by Crim.R. 16(K), because there is no dispute in this case that the state timely disclosed Nurse Wood's written report. (Emphasis added.)  *Compare State v. Opp*, 3d Dist. No. 13-13-33, 2014-Ohio-1138, ¶ 9-16, quoting *State v. Sage*, 31 Ohio St.3d 173, 180 (1987) (summarizing decisions declining to strictly apply the last sentence of Crim.R. 16(K), and expressing its intention to "continue to apply the long-established precedent, which holds that questions regarding the admission or exclusion of evidence are within the trial court's discretion, * * * in connection with violations of Crim.R. 16(K).").  *See also State v. Allenbaugh*, 11th Dist. No. 2019-A-0017, 2020-Ohio-68, ¶ 33-34.

**{¶ 83}** We refuse to give the mandatory exclusion language of Crim.R. 16(K) the broad reading Mr. Harris proposes, as such construction would run afoul of the plain and unambiguous language of the rule.  In fact, Mr. Harris's contention that the trial court was required to exclude Nurse Wood's trial testimony is belied by the sentence which precedes the language on which he relies.  That sentence provides that an expert's written report and summary of qualifications "shall be subject to disclosure under this rule no later than twenty-one days prior to trial, ***which period may be modified by the court for good cause shown, which does not prejudice any other party***."  (Emphasis added.) Crim.R. 16(K).  We read this sentence as expressly providing for a trial court's discretion in addressing a party's failure to comply with the timing requirements of the rule.

**{¶ 84}** Thus, to prevail on his third assignment of error, Mr. Harris must show the trial court abused its discretion in modifying the 21-day period applicable to the pre-trial production of Nurse Wood's CV.  But, Mr. Harris does not contend on appeal that good cause was not shown, that he was prejudiced in any meaningful way by the belated disclosure of Nurse Wood's CV, or that the exclusion of Nurse Wood's testimony would

have changed the result of his trial. And, on review of the record below, we do not find any viable basis to make such contentions.

**{¶ 85}** The trial court found, on the facts of this case, good cause existed to modify the disclosure deadline, and summarized those reasons. First, it noted defense counsel knew, before trial, that Nurse Wood was a registered nurse. (Nov. 2, 2021 Entry at 1. *See* Tr. Vol. III at 403.) The trial court also pointed out that Nurse Wood's report was timely produced and complied with Crim.R. 16(K)'s requirements. (*See* Nov. 2, 2021 Entry at 2. *See, e.g.*, Tr. Vol. III at 402-03.) And, the trial court emphasized that, despite knowing Nurse Wood's CV had not yet been produced, Mr. Harris's trial counsel did not raise this issue until the day of trial, albeit before the jury was impaneled (Nov. 2, 2021 Entry at 2. *See, e.g.*, Tr. Vol. I at 10; Tr. Vol. III at 406-07.) The trial court further found that the state's failure to timely produce Nurse Wood's CV was not done in bad faith, but rather, borne out of a "ministerial oversight." (Nov. 2, 2021 Entry at 2.)

**{¶ 86}** The trial court also concluded that Mr. Harris would not suffer prejudice from its decision to modify the state's disclosure period. It noted that defense counsel received Nurse Wood's CV more than a day prior to her testimony, thus giving him adequate time to incorporate any relevant details gleaned from the CV into his cross-examination preparations. (*See* Nov. 2, 2021 Entry at 2-3.) And, the trial court pointed out that, if the prejudice from the belated disclosure were so great, Mr. Harris likely would have availed himself of the trial court's proposed remedy of a 22-day continuance, which would guarantee the state's compliance with the rule. (*See* Nov. 2, 2021 Entry at 3.)

**{¶ 87}** On review, we find the trial court's analysis is supported by the record. Thus, we cannot say the trial court abused its discretion in enlarging the state's expert disclosure period, as provided for in Crim.R. 16(K) and denying Mr. Harris's motion to exclude Nurse Wood's testimony at trial. It is undisputed that Mr. Harris's trial counsel had Nurse Wood's expert report "months"—and, most certainly, more than 21 days—before trial. (*See* Tr. Vol. I at 10. *See also* Tr. Vol. III at 402-03.) It is also undisputed that Mr. Harris's trial counsel did not notify the state about its failure to produce Nurse Wood's CV until the morning of trial. (*See* Tr. Vol. I at 10.) The trial court proposed a remedy—in the form of either a brief (24 hours) or extended (22 days) continuance of trial—to address the state's noncompliance with Crim.R. 16(K). (Tr. Vol. I at 14-18.) But, Mr. Harris rejected both. (Tr. Vol. I at 14-

18.) And, the state provided defense counsel with Nurse Wood's CV over 24 hours before she testified at trial. (*See* Tr. Vol. I at 215-16; Tr. Vol. III at 403.)

{¶ 88} Significantly, we note that defense counsel's concerns about the state's untimely production of Nurse Wood's CV were expressed in connection with Mr. Harris's felonious assault and kidnapping charges. (Tr. Vol. III at 404-08.) Defense counsel did not contend, however, that the state's untimely production of Nurse Wood's CV impacted Mr. Harris's ability to present a defense as to the aggravated burglary offense. This point is relevant to our analysis of whether Mr. Harris was prejudiced by the trial court's enlargement of the state's disclosure period under Crim.R. 16(K), as the aggravated burglary was the only offense for which Mr. Harris was convicted.

{¶ 89} Nurse Wood's expert testimony and opinion about the cause or severity of L.A.'s injuries had minimal relevance to the jury's evaluation of whether the state's evidence proved, beyond a reasonable doubt, that Mr. Harris trespassed in D.D.'s house by force, with the purpose to commit an assault offense, and inflicted, attempted to inflict, or threatened to inflict physical harm on L.A. *See* R.C. 2911.11(A)(1). The evidentiary support for the essential elements of that offense was borne out, in large part, by the testimony of D.D. and L.A. about the events that took place on June 24, 2020. This means that, even assuming Nurse Wood's testimony should have been excluded from trial, the trial court's failure to do so *still* would not rise to the level of reversible error under the facts and circumstances of this case. Mr. Harris does not argue on appeal, did not argue in the trial court, and the record before us does not support a finding that, had Nurse Wood's testimony been excluded from trial, the jury would not have found Mr. Harris guilty of the aggravated burglary offense.

{¶ 90} For the foregoing reasons, we overrule Mr. Harris's third cross-assignment of error.

### D. Fourth Cross-Assignment of Error

{¶ 91} In his fourth cross-assignment of error, Mr. Harris argues he received ineffective assistance of trial counsel. Those arguments are not well-taken.

### 1. Controlling Law and Standard of Review

{¶ 92} A defendant asserting a claim of ineffective assistance of counsel must establish: (1) counsel's performance was deficient or objectively unreasonable, as determined by " 'prevailing professional norms;' " and (2) that the deficient performance of counsel prejudiced the defendant. *State v. Spaulding*, 151 Ohio St.3d 378, 2016-Ohio-8126, ¶ 77, quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

{¶ 93} To show trial counsel's performance was deficient or unreasonable, the defendant must overcome the presumption that counsel provided competent representation and must show counsel's actions were not trial strategies prompted by reasonable professional judgment. *Strickland* at 689. Counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance. *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998). Tactical or strategic decisions, even if unsuccessful, do not generally constitute ineffective assistance of counsel. *State v. Frazier*, 61 Ohio St.3d 247, 255 (1991). Rather, the errors complained of must amount to a substantial violation of counsel's essential duties to his client. *See State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989).

{¶ 94} Prejudice results when " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Bradley* at 142, quoting *Strickland* at 694. " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Id.*, quoting *Strickland* at 694.

{¶ 95} When analyzing an ineffective assistance of counsel claim, an appellate court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland* at 697. *See also State v. Wade,* 10th Dist. No. 20AP-456, 2021-Ohio-4090, ¶ 19. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice * * * that course should be followed." *Strickland* at 697.

### 2. Analysis

{¶ 96} Mr. Harris asserts his trial counsel was ineffective in two respects: (1) failing to object to the introduction of prior bad acts testimony; and (2) deficiently cross-examining several of the state's witnesses. (Brief of Cross-Appellant at 34-40.)

Additionally, Mr. Harris asserts the cumulative effect of these alleged errors rendered his trial counsel ineffective.

{¶ 97} As to the merits of each ineffective assistance allegation, the state argues Mr. Harris has failed to rebut the presumption that his trial counsel provided him with adequate representation. The state also contends that Mr. Harris has failed to demonstrate how he was prejudiced by any of the alleged errors individually or cumulatively.

### a. Failure to object to testimony and evidence about prior bad acts.

{¶ 98} Mr. Harris first alleges his attorney was ineffective for failing to object to the introduction of irrelevant and inadmissible prior bad acts evidence presented to the jury through L.A.'s testimony. During L.A.'s direct examination, the trial prosecutor asked L.A. why she did not feel as though she could leave her home while Mr. Harris was there. (Tr. Vol. II at 257.) In response, L.A. stated: "Because previous times [Mr. Harris] said he was going to kill me so I thought it was my time." (Sic.) (Emphasis deleted.) (Brief of Cross-Appellant at 34, citing Tr. Vol. II at 257.) It is this single piece of inferential evidence—that is, the "previous times" reference which could be construed as suggesting Mr. Harris had assaulted L.A. before—to which Mr. Harris contends his trial counsel should have objected.

{¶ 99} In his brief, Mr. Harris does not argue this evidence was not relevant under Evid.R. 401. (*See* Brief of Cross-Appellant at 34-37.) In any event, we conclude that it was. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. "Evidence which is not relevant is not admissible." Evid.R. 402. From our review of the record, it is clear that part of the defense's trial strategy was to undermine the veracity of L.A.'s allegations by emphasizing her delay in reporting the incident. (*See, e.g.*, Tr. Vol. II at 309-11.) The testimony at issue was therefore relevant to explaining such delay.

{¶ 100} Mr. Harris instead argues his trial counsel's failure to object to this evidence under Evid.R. 403 constituted deficient performance. Generally, he contends that this brief, singular, and vague reference to "previous times" may have tainted the jury's perception of him and, somehow, bolstered L.A.'s allegations. (Brief of Cross-Appellant at 37.)

**{¶ 101}** "Evidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Evid.R. 404(B)(1). However, such evidence may be relevant for other purposes, including to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*; *accord* R.C. 2945.59. The list of permitted purposes in Evid.R. 404(B) is not exhaustive. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 18. Rather, "evidence of other crimes, wrongs or acts may be admissible for any purpose material to the issue of guilt or innocence, as long as it is not being introduced for the purpose of showing the accused's propensity to commit bad acts." *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 49 (2d Dist.). But, even if evidence is relevant, it is not admissible "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A).

**{¶ 102}** Assuming arguendo that the challenged other-acts statement was inadmissible, however, the "failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway*, 38 Ohio St.3d 239, 244 (1988). *See also State v. Pawlak*, 8th Dist. No. 99555, 2014-Ohio-2175, ¶ 81-83; *State v. Taylor*, 10th Dist. No. 12AP-870, 2013-Ohio-3699, ¶ 33-35. As the Ohio Supreme Court has explained:

> "[E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice."

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, quoting *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir.2006).

**{¶ 103}** In this case, defense counsel's failure to object to the challenged testimony can be reasonably viewed as trial strategy or tactical choice. There was only one vague reference to "previous times" over the course of a three-day trial, which was not invited by the prosecutor and did not amount to anything more than a brief and ambiguous mention

of the prior history. The reference was not detailed and, once it was made by L.A., the prosecutor did not pursue any additional inquiry about the topic. An objection to this imprecise and fleeting comment could have brought a heightened awareness to any suggestion that Mr. Harris had previously threatened, assaulted, or kidnapped L.A.—something trial counsel might have intended to avoid. Accordingly, we find trial counsel's failure to object to L.A.'s reference to "previous times," even if erroneous, may have been a reasonable tactical choice. Thus, we conclude counsel's failure to object to this other-acts evidence did not constitute deficient performance.

{¶ 104} We further find that Mr. Harris has failed to demonstrate prejudice, or a reasonable probability that, but for his trial counsel's failure to object to this brief and non-descriptive reference to previous encounters between Mr. Harris and L.A., the result of the proceeding would have been different. Even assuming the jury heard and understood L.A.'s mention of "previous times" as referring to prior crimes committed by Mr. Harris, the jury's verdict—which included acquittals on two counts, including the felonious assault offense—belies his claim that the admission of this evidence generally tainted the jury's view of him, so as to satisfy *Strickland*'s prejudice prong. *See*, *e.g.*, *State v. Gardner*, 2d Dist. No. 21357, 2010-Ohio-6479, ¶ 33. And, as already described above, the state produced ample evidence supporting the aggravated burglary offense for which Mr. Harris was convicted. In light of the overwhelming evidence of Mr. Harris's guilt as to that offense, we do not believe trial counsel's failure to object to the other-acts evidence impacted the outcome of Mr. Harris's trial.

{¶ 105} Based on the foregoing, we find trial counsel's failure to object to L.A.'s reference to "previous times" as impermissible other-acts evidence did not constitute ineffective assistance of counsel.[3]

---

[3] Although he does not attribute error to trial counsel's failure to request or the trial court's failure to give a limiting instruction concerning the other-acts evidence suggested by L.A.'s reference to "previous times," he nonetheless contends that the absence of such instruction "further prejudice[ed] [Mr.] Harris." (Brief of Cross-Appellant at 37.) We note, however, that the Ohio Supreme Court has expressly cautioned trial courts, however, about giving such limiting instruction *sua sponte* any time other-acts evidence is presented at trial. "Depending on the nature of the other-acts evidence and the context in which it is used, defense counsel may as a matter of strategy wish to avoid highlighting the evidence for the jury." *State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, ¶ 67, citing *State v. Schaim*, 65 Ohio St.3d 51, 61 (1992), fn. 9 ("the decision not to request a limiting instruction is sometimes a tactical one, and we do not wish to impose a duty on the trial courts to read this instruction when it is not requested"). Thus, Mr. Harris's contention is not well-taken.

**b. Deficient performance during cross-examination of the state's witnesses.**

{¶ 106} Mr. Harris also contends his trial counsel's cross-examination of some witnesses constituted ineffective assistance of counsel. Specifically, Mr. Harris complains that his trial counsel's line of questioning of D.D., Detective Wright, and Nurse Wood was deficient because his attorney asked each of them "one question too many"—or, more broadly, bad questions—which elicited responses unfavorable to Mr. Harris. (*See* Brief of Cross-Appellant at 38-40.)

{¶ 107} Generally, "[t]he extent and scope of cross-examination clearly fall within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, ¶ 146. Moreover, " 'an appellate court reviewing an ineffective assistance of counsel claim must not scrutinize trial counsel's strategic decision to engage, or not engage, in a particular line of questioning on cross-examination.' " *State v. Dorsey*, 10th Dist. No. 04AP-737, 2005-Ohio-2334, ¶ 22, quoting *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 40. *See also State v. Allah*, 4th Dist. No. 14CA12, 2015-Ohio-5060, ¶ 23.

{¶ 108} After our review, we do not find the record before us supports the argument that trial counsel's cross-examination of these three witnesses constituted deficient performance under *Strickland*. In Ohio, it is often difficult for attorneys in criminal trials to anticipate how a witness called by the opposing party will respond to questions because, unlike in civil cases, the Ohio Rules of Criminal Procedure do not provide for pre-trial discovery depositions. The record demonstrates that defense counsel's strategy at trial was to suggest that either L.A. was not injured at all or that her injuries were not serious. And, the questions Mr. Harris now takes issue with on appeal were on par with that strategy. Although trial counsel's questions did not result in the responses he hoped for and perhaps could have been more craftily worded, we cannot say they fell outside the realm of reasonable trial strategy.

{¶ 109} Moreover, Mr. Harris fails to demonstrate prejudice, or a reasonable probability that, but for his trial counsel asking each of these three witnesses a single question that elicited from each an answer that undermined Mr. Harris's claim that L.A.'s injuries were not serious, the result of the proceeding would have been different. The felonious assault and kidnapping offenses Mr. Harris was charged with prohibit a person

from causing ***serious physical harm*** to another in conjunction with the commission of the offense. R.C. 2903.11(A)(1); R.C. 2905.01(A)(3). *See* R.C. 2901.01(A)(5) (defining "serious physical harm to persons"). And, significantly, the jury acquitted Mr. Harris of both the felonious assault and kidnapping counts. But, for Mr. Harris to be convicted of the aggravated burglary offense of which the jury found him guilty, the state was only required to show Mr. Harris inflicted, attempted, or threatened to inflict ***physical harm*** on another during the course of trespassing in an occupied structure by force and with purpose to commit a criminal offense while inside. R.C. 2911.11(A)(1). "Physical harm to persons" is broadly defined by Ohio law to include "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 110} To support the prejudice prong of *Strickland*, Mr. Harris contends his trial counsel's questioning of the state's witnesses resulted in answers that undermined Mr. Harris's contention that L.A.'s injuries were either nonexistent or not serious. But the jury was not required to find Mr. Harris caused serious physical harm—or, for that matter, any physical harm—to L.A. in order to convict him of the aggravated burglary offense. As described above, the state produced ample evidence suggesting Mr. Harris attempted to cause, threatened to cause, and/or actually caused physical harm to L.A. on June 24, 2020. Accordingly, we do not find his trial counsel's cross-examination questioning of these three witnesses impacted the outcome of trial.

{¶ 111} Based on the foregoing, we find Mr. Harris fails to demonstrate either the deficient performance or prejudice *Strickland* requires to support this allegation of ineffective assistance of counsel.

### c. Cumulative Error.

{¶ 112} Finally, Mr. Harris argues his trial counsel was ineffective based on the cumulative effect of his errors during the trial. "Under this doctrine, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous errors does not individually constitute cause for reversal." *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 169. *See also State v. C.D.S.*, 10th Dist. No. 20AP-355, 2021-Ohio-4492, ¶ 112. As applied to a claim for ineffective assistance of counsel, "[e]ach assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim; when none of the

individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together." *Graham* at ¶ 170.

{¶ 113} Because each of Mr. Harris's individual claims of deficient performance is without merit, we find that he has failed to show cumulative error sufficient to reverse his convictions. We therefore find that Mr. Harris is unable to demonstrate ineffective assistance of counsel.

{¶ 114} Based on the foregoing, Mr. Harris's fourth cross-assignment of error is overruled.

## III. ANALYSIS OF THE STATE'S SOLE ASSIGNMENT OF ERROR

{¶ 115} The Reagan Tokes Law, effective March 22, 2019, amended 50 sections of the Revised Code and adopted four new sections. R.C. 2901.011. In general, the law provides that first-degree and second-degree felonies not already carrying a life sentence are subject to an indefinite sentencing scheme. Specifically, it requires a sentencing court to impose a stated minimum sentence as provided in R.C. 2929.14(A)(2)(a) and an accompanying maximum term as provided in R.C. 2929.144 for non-life-sentence felony offenses of the first or second degree committed on or after March 22, 2019. The aggravated burglary offense for which Mr. Harris was convicted occurred in June 2020, is a first-degree felony, and is not subject to the possibility of a life prison sentence.

{¶ 116} R.C. 2967.271 specifies how the minimum and maximum prison terms affect the amount of time a defendant sentenced under the Reagan Tokes Law will be incarcerated. Generally, there is a rebuttable presumption that a defendant will be released from prison after serving the minimum term imposed by the sentencing court. *See* R.C. 2967.271(B). But the Ohio Department of Rehabilitation and Correction ("ODRC") "may rebut [that] presumption" if it—being the ODRC—"determines, at a hearing" that one of the conditions specified in R.C. 2967.271(C) apply. In that event, the ODRC "may maintain the offender's incarceration" up to the maximum prison term set by the sentencing court. R.C. 2967.271(D)(1).

{¶ 117} Concerns about the constitutionality of the new law arose in Ohio's common pleas courts shortly after its enactment. *See, e.g.*, *State v. O'Neal*, 1st Dist. No. C-190736, 2022-Ohio-3017 (reversing trial court's decision refusing to impose indefinite sentence based on its finding that the indefinite sentencing provisions of the Reagan Tokes Law

violated the constitutional safeguards of procedural due process and separation of powers); *State v. Simmons*, 8th Dist. No. 109476, 2021-Ohio-939 (the same).  And, we note that, at the time Mr. Harris was sentenced, neither this court nor the Supreme Court had ruled upon the constitutionality of the new law.

{¶ 118} While this appeal was pending, however, the Supreme Court issued a decision finding the Reagan Tokes Law to be facially constitutional.  *Hacker*, 2023-Ohio-2535 at ¶ 41.  Pursuant to that decision, we must conclude the definite sentence imposed by the trial court for the aggravated burglary offense is contrary to law.

{¶ 119} Accordingly, the state's sole assignment of error is sustained.

## IV.  CONCLUSION

{¶ 120} Having overruled each of Mr. Harris's four cross-assignments of error and sustained the state's sole assignment of error, we vacate the nine-year prison sentence imposed by the January 3, 2022 judgment of the Franklin County Court of Common Pleas and remand this matter for a resentencing hearing on the aggravated burglary offense in accordance with the Reagan Tokes Law.[4]

*Sentence vacated*; *cause remanded*.

MENTEL and BOGGS, JJ., concur.

————————————

[4] At the December 3, 2021 sentencing, the trial court credited Mr. Harris with 487 days of pre-sentencing jail-time credit. On remand, the trial court should, after imposing an indefinite sentence in accordance with this decision and Ohio's sentencing laws, calculate how many post-sentencing days Mr. Harris has been incarcerated in connection with this case and credit those days—along with the 487 days of pre-sentencing jail-time credit—as time-served towards the new prison sentence it imposes.